By the Court. Duer, J.
A motion has been made in this case for an attachment against Oscar W. Sturtevant, one of the aldermen of this city, for an alleged contempt of the authority of this court, by an act of positive disobedience to its lawful . process.
*479 The material facts that have given rise to the motion, and upon which its determination, in a measure, rests, I shall endeavor to state in few words.
On the 27th of December last, the plaintiffs, in their own right, and on behalf of all others, the tax-paying inhabitants of this city, exhibited their complaint, duly verified, to our associate, Hr. Justice Campbell, who, on the same day, in conformity to the prayer of the complaint, and holding that the matters set forth therein entitled the plaintiffs to the relief demanded, granted an order of injunction, commanding and enjoining (inter aMa) that the defendants, the mayor, aldermen, and commonalty of the city, and each of them, should absolutely desist and refrain from granting to, or in any manner authorizing Jacob Sharp and others (the persons named in a resolution of which a copy was annexed to the complaint), or any other person or persons, the right, liberty, or privilege of laying a. double or any track for a railway in the street known as Broadway, in this city, from the South Ferry to Fifty-ninth street, or any railway whatever.
The resolution of the Common Council, to which the complaint and injunction refer, is upon its face, not only by its manifest intent, but by its express words, a grant of permission or authority, upon certain conditions and stipulations, to Jacob Sharp, and other persons named as his associates, to lay a double track for a railway in Broadway and Whitehall or State street from the South Ferry to Fifty-ninth street; and to render the resolution, when finally adopted, effectual as a grant, nothing more was required than that the persons named as associates should, by a writing to be filed with the clerk of the Common Council, signify their acceptance. The complaint alleged that the resolution had, before that time, been adopted by each board of the Common Council, and had been returned by the mayor, with his objections, to the Board of Aldermen in which it originated, and averred that those members of each board (constituting in each a majority of those elected), by whose votes the resolution had originally passed, had given out and declared that they intended again to pass the same, notwithstanding the objections of the mayor, and that the grantees named in the resolution had also made known *480 their intention to file their written acceptance immediately upon its adoption.
The actual conduct of the parties corresponded with these anticipations.
On the 28th of December, the order of injunction, together with a copy of the summons and complaint, was duly served upon the mayor, and upon the same or the following day, the injunction, with a copy of the summons, was served upon each member of the Board of Aldermen.
On the evening of the 29 th of December the Board of Aider-men met, and the resolution making the grant to Sharp and his associates being brought forward for reconsideration, it was again passed—the alderman now before us and twelve of his associates voting for its adoption. And, in order, it would seem, that no doubt might remain as to the nature and motives of their action, the majority of the board, upon the same evening, and upon the motion of Alderman Sturtevant, adopted certain resolutions, which are set forth at large in the papers before us, but which we deem it unnecessary now to recite.
It is sufficient to say, that one of these resolutions declared^ that it was the duty of the Common Council to protect its own dignity and the rights of its constituents, the people of the city, “ by utterly disregarding the injunction upon its legislative action, and declaring their sense of the same and that a preamble to the resolution, which was adopted with them, declared their sense of the injunction by denouncing it, in no measured terms, as an attempt, without color of law or justification, to direct and control the municipal legislation of the city; as bearing upon its face a character of indirection, not less unjustifiable and not less unworthy the judiciary, than its usurpation of authority and ■ jurisdiction, and as a precedent of an unwarranted and unwarrantable interference with the rightful functions, powers, and duties, of a legislative body.
The original resolution or grant, and the additional resolutions vindicating the rights and dignity of the Common Council, were transmitted to the Board of Assistant Aldermen, and, on the evening of the 30th of December, the original resolution was adopted by that body; but whether any action was then, or has since been, taken on the additional resolutions, does not *481 appear. On the same evening the associates named in the original resolution, by a writing signed by them all, and filed with the clerk of the Common Council, signified their acceptance of the resolution, and their agreement to conform thereto; and thus, if these proceedings were valid, the grant, which the order of injunction prohibited the defendants from making, became absolute, and the grantees acquired the very right, liberty, and privilege of laying a track for a railway in Broadway, which the injunction, by express words, had strictly commanded should not be given.
It follows from the statement that has now been made, that a majority of the members of the present Board of Aldermen have deliberately chosen to place themselves towards this court and its proceedings (for the act of the judge, who issued the injunction, is that of the court—Code, § 218) in a relation of direct and open hostility. Admitting their own knowledge of the order of injunction, and of the reasons upon which it was founded—reasons which they have declared to be untenable in law and unfounded in fact—construing the order as commanding them to desist and refrain from the performance of the act which they were determined to perform, and have performed —they have chosen to treat it as an illegal assumption of authority, an exercise of power without right, which their duty to themselves and to their constituents required them to disregard and resist. Relying on their own knowledge and convictions, not only of their own duties and powers, but of the duties and powers of the judiciary of the State, they have publicly raised an issue which this court is compelled to meet and bound to determine. That issue is, whether this court, by an unprecedented stretch of judicial authority, has invaded the province, and violated the rights, of the C ommon Council as a legislative body, or those members of that body, who have openly denied and boldly disregarded the authority of this court, are guilty of the criminal disobedience with which they are charged, and we are now called upon to punish.
The questions, therefore, which this motion involves, possess no ordinary interest. It is felt by all, that they are, in no ordinary degree, grave and delicate. With a just sense of their importance, they have been elaborately argued by the counsel ' *482 of the parties, and have been carefully and anxiously considered by ourselves. For obvious reasons, it would be desirable, were it possible, that these questions should be determined by another tribunal; but, as no such transfer can be made of our jurisdiction, we must not and will not shrink from the responsibility which the law imposes.
If the injunction that has- been issued was indeed an unjustifiable excess of jurisdiction—an unprecedented act of judicial power—it will be our duty to confess, and, with all possible expedition, correct the error ; but if -the lawful mandate of this court, issued in the exercise of its known jurisdiction, has been publicly denounced and .wholly disregarded by those to whom it "was directed, and who were, from their official position, under a peculiar obligation to respect and obey it, we should indeed be unworthy of our station, could we hesitate to maintain firmly the rights of the judiciary, and vindicate effectually the insulted, but, we trust, still paramount authority of the law.
We proceed to the immediate consideration of the questions that have been discussed.
It has been contended that Alderman Sturtevant is not liable to an attachment for the contempt with which he is charged, for the following reasons :
First, Because he is not a party to the suit, and the law is feettled that it is only a party against whom relief is sought and may be given, who is bound by an injunction.
Second, Because the service of the injunction upon him was irregular and void, not being accompanied by the service of a copy of the affidavit, the verified complaint, upon which it was founded.
Third, Because the only breach of the injxmetion with which he is charged, consists in the act of voting for the resolution to which it refers; an act to which the terms of the injunction do not apply, and which they were not intended to restrain.
And lastly, Because if the injunction must be construed as intended to restrain the reconsideration and adoption by the Common Council of the resolution in question, the prohibition) as illegal and void, was properly disregarded ; no court of law Or equity having any jurisdiction to control, in any case, or for *483 any reasons, the legislative action of a corporate, and- more especially, of a municipal body.
These objections will be considered in the order in which they have been stated.
The first, that Mr. Sturtevant is not a party to the suit, and, therefore, was not bound to obey the injunction, we are all of opinion cannot be sustained.
It is unnecessary now to determine the question whether, under the provisions of the Code (section 219), a person to whom an injunction is directed is wholly excused from obedience unless he is a party to the suit, and one of those against whom relief is demanded. It will be time enough to consider and decide this question (which is, perhaps, more doubtful than it seems to have been regarded), when it shall properly arise in a case before us. It does not arise in the case now before us, for the plain reason, that Mr, Sturtevant is, in judgment of law, a party to the suit. ' He is not indeed a party in his proper name, or as a mere individual, but he is so, in his official character, and it is his personal action in that character that the injunction, not only by its legal construction, but by-its express words, seeks to restrain. It is not addressed to the Mayor, -Aldermen, and Commonalty of the city as an abstract metaphysical being, but it is addressed to each individual member of the whole corporate body, and it controls the personal action of every one of them whose consent or co-operation might be necessary to the completion of the corporate act, which it strictly prohibits. It imposes a command and duty upon every one of them to refrain absolutely from performing or concurring in the performance of 'the prohibited act, for the very purpose, and as the necessary means, of preventing it from becoming an act of the Corporation. It is not true, as the objection-we are considering plainly assumes, that when a judicial command in relation to a corporate act, a mandamus, or injunction, is directed to a corporation solely by its corporate name, the members and officers through whom alone the Corporation can-act, may disregard it with ebtire impunity, and by their disobedience render the process of the court wholly ineffectual. The law, we apprehend, is otherwise settled. That the mandate of the court in these eases may with entire propriety be directed exclusively *484 to the corporate body, by its corporate name, has not been denied, and there are numerous decisions that show, that when such is the form of the order or writ, it is operative and binding, not only upon the corporation itself, but upon every person whose personal action, as a member or officer of the corporate body, it seeks to restrain or control. Every such person is as fully bound to personal obedience, as if personally named in the process, and consequently is just as' liable for his disobedience. (Rex vs. Mayor of Abingdon, 1 Lord Raymond, 560; Rex vs. Mayor of Shelford, 2 Cases in Chan. 171-2, Lord Raymond, 848; Rex vs. Mayor of Tregony, 8 Mod. 111; Bank Commissioner vs. City Bank of Rochester, 1 Barb. Ch. R. ps. 636.) We understood the learned counsel for the defendants to admit that in the case of a mandamus, the law is such as we have stated; and we are clear in the opinion, that in respect to the persons upon whom it operates, there can be no distinction between a mandamus and an injunction. Indeed, all the decisions rest upon the same principle, a principle which Lord Kenyon, in the case of Rex v. Holland, has briefly and forcibly stated. (5 Term. R. 622.) It is, that where “ a duty is thrown upon a body consisting of several persons, each is individually responsible for its performance, and individually liable for its breachand in the application of this principle, it is plainly immaterial, whether the duty result from an act of the Legislature, or the mandate of a court of justice.
We remark, in conclusion, that upon any other construction than that which we adopt, an injunction addressed exclusively to a corporation must be, in all cases, a nugatory and senseless proceeding. A corporation cannot be attached, nor have we been able to discover that there are any means by which, when such is the form of the injunction, its obedience, as a corporation, may be compelled, or its disobedience punished. And that there are none, Lord Loughborough, in the case of the Mayor of London v. the Mayor of Lynn, seems distinctly to admit. (1 H. Black. 209.) Unless the injunction, therefore, in such cases, operates upon those members and officers of the Corporation by whom its corporate w'ill is' manifested, and corporate acts performed, and unless it creates a duty for which they, as parties to the suit, are personally responsible, it *485 is emphatically brutum fulmen—the words may be those of command or menace, but they are addressed to no one, and signify nothing. i
The next objection, that the omission to serve upon the aldermen, with the injunction, a copy of the complaint, rendered the service of the injtmction itself, as to them, inoperative and void, like (he preceding, we are satisfied, must be overruled. It furnishes, in this case, no reason for not proceeding to an attachment.*
Notwithstanding the positive terms of the Code (sec. 220), we doubt exceedingly whether, when the injunction itself is duly served, the omission to serve a copy of the affidavit upon which it was founded, may, in all cases, be alleged as a valid excuse for disobedience. When the order of injunction cannot properly be understood, nor, consequently, be obeyed, without a knowledge of the contents of the affidavit, the service of a copy must doubtless be made. But when the injunction is plain and explicit, and leaves no doubt as to the act which the party upon whom it is served is required to perform, or desist from performing, it may well be doubted, whether the irregular omission of the affidavit should be held to release him from the duty of obedience. In such cases, a knowledge of the contents of the affidavit would neither instruct him as to. Ms duty, nor avail to discharge him from its performance, since whatever may be the facts stated in the affidavit, the injunction, when emanating from a competent authority, until dissolved, must be obeyed. (Krom v. Hogan, 4 Howard, P. R. 225; Woodward v. King, 2 Ch. Ca. 203; Sullivan v. Judah, 4 Paige, 446.)
The purpose for which the Code very properly requires that a copy of the affidavits shall in all' cases be served, is, not that the party upon whom it isserved may determine, whether he will or will not obey the injunction, but merely to enable him, without delay, if so advised, to move for its dissolution.
It is not, however, upon the ground that in this case the alleged irregularity in the service of the injunction was not such as to excuse the disobedience that followed, that we overrule the objection. The papers show that there was, in truth, no irregularity that the defendant, Sturtevant, can- be *486 permitted to allege. A copy of the complaint, together with the injunction, was duly served upon the mayor, on the 28th of December, the day before the meeting of the board of aldermen. The service was properly made upon him as the chief officer (2 R. S. p. 458, section 5), and for that purpose the representative of the whole Corporation, and we are clearly of opinion that this service was sufficient and effectual, as to every member of the corporate body whose personal conduct, as such, the injunction was designed to control; and to whom the actual knowledge of its contents may justly be imputed. That the defendant, Sturtevant, and the aldermen who acted with him, possessed this knowledge is not denied, and it even seems that they well knew what were the allegations in the complaint itself. They have resolved that the reasons alleged for the injunction “ were untenable in law and unfounded in fact.” It is only in the complaint, however, that these reasons are alleged, and it is therefore from the complaint that their knowledge of them must have been derived. Under these circumstances, it would indeed be a mockery of justice to permit the alleged irregularity, in the service of the injunction, to excuse its deliberate and confessed violation^-eonfessed, we mean, in the resolutions of the aldermen, although not in the arguments of their counsel.
Passing, then, from objections merely preliminary and formal, we proceed to an inquiry which touches, in a measure, the merits of this motion, namely—whether the defendant, Sturtevant, has, in fact, been guilty of the contempt with which he is charged; and this he certainly has not, unless he has committed some act from which the injunction, by its terms or its necessary construction, commanded, him to desist and refrain. It is true that Mr. Sturtevant, and those who acted with him, have publicly declared that they understood the injunction in the very sense for which the counsel for the plaintiff contend, as the only sense of which its terms are susceptible. And it is also true, that thus understanding the injunction, they not only disregarded, but proceeded, so far as depended on their own action, to rescind and nullify it; but we shall not hold that they are concluded by their mistake, if a mistake they have committed. Their error does not work an estoppel, for, unless they have violated the injunction in its true legal construction, there *487 has been no breach for which they are liable to be punished as a contempt, whatever may be thought of their intentions and their language.
What, then, is the command of the injunction ? What the corporate act which its terms prohibit ?
If we read the complaint, it is manifest, that the sole object of its prayer, which the injunction exactly followed, was to prevent the adoption of the resolution in relation to a railroad in Broadway, which it alleged that the Common Council meant to reconsider, and had determined to pass ; but we have some doubts, whether the allegations in the complaint can with propriety be invoked to govern the construction of the injunction, and it is therefore to the terms of the injunction that, in considering the question we have proposed, we mean to confine ourselves. The language of the injunction is clear and unambiguous. The corporate act which it prohibits is that of granting to Jacob Sharp and his associates, or to any other person, the authority and privilege of laying down a double or any other track for a railway in Broadway, between certain limits; and if no such grant, as a corporate act, has been made, the injunction has not been violated. The fact, however, that such a grant has been made is undeniable : it is not only confessed by all, but avowed and gloried in by those who made it and by those who have obtained it. The resolution making the grant has been reconsidered and adopted, and, in the very mode which it prescribes, has been accepted by the grantees; and Jacob Sharp and his associates now claim to possess, by a valid title, the very right, liberty, and privilege which the injunction, speaking the voice and carrying with it the authority of this court, has said they should not be permitted to acquire. The corporate act that the injunction prohibits has been performed, and it therefore seems an affront to common sense to say that the injunction has not been violated. It has been violated just as certainly as if, by express words, it had forbidden the passage of the resolution it was designed to prevent. We repeat, the injunction has been violated; and the only inquiry that remains is—By whom has it been violated, and who, assuming it to have been rightfully issued, are amenable to this court for their contempt of its authority %
*488 It is idle to speak of its violation as merely a corporate act, for which no member or officer of the Corporation is or can be liable. We have already shown that an injunction may be properly directed to a corporation solely by its corporate name, and that, when so directed, it operates to restrain the personal action of every member of the corporate body by whose assent or co-operation the corporate act that is forbidden may be accomplished.
In the case before us, the injunction not only commanded the Board of Aldermen and the Board of Assistants not to make the grant to Jacob Sharp and his associates, which it describes, but it commanded each alderman and each assistant not to give his assent to any such grant, if proposed for his adoption, —not to give his assent to it, for the purpose, and with the intent, of rendering it operative and effectual as a corporate act. The resolution adopted by the Common Council is the very grant that the injunction describes, and to this grant every alderman who voted for the resolution, with the intent that it should take effect as a corporate act, has given his assent. Every one of them, therefore, who has thus assented, the conclusion is plain and irresistible, has done the very act that the order of the court commanded him not to do, and, by so doing, has violated its mandate and contemned its authority. And unless this be true it follows that when an injunction, directed to a body consisting of several persons, commands them not to perform a joint act, although all unite in performing the act, no one of them breaks the injunction—no one of them is liable to be punished.
Two partners intend, by their joint act, to make a fraudulent transfer of their whole partnership property; suspecting their design, their creditors file a complaint, and obtain and serve an injunction, by which the intended transfer, the meditated fraud, is strictly forbidden. Hie transfer is, however, made, the fraud accomplished, the authority of the court defied, and the guilty partners rejoice in their impunity. Neither of them, it seems, can be attached, for the valid reason, that the fraudulent transfer was the act of both, and, therefore, the act of neither.
Let it not be said that the supposed case is not analogous; *489 the analogy, in truth, is perfect, for it is not at all affected or impaired by the circumstance that the body to which, in the present case, the injunction was directed, was a corporation, not a partnership. The injunction in this case commanded the Common Council not to make a certain grant to certain persons. The Common Council has made the grant; yet we are told that the injunction has not been broken, or, if broken, has been broken by the Common Council alone, the two boards forming the body, and not at all by the individual members, by whose concurrent votes the grant, as a corporate act, was adopted and effected.
In conclusion, the whole argument, it is manifest, depends upon the truth of the proposition with which we started, namely, that an injunction directed to a corporate body, is binding upon the individual conscience, and restrains the individual action, of each of its members. If this, as a proposition of law, is certainly true, and that it is so we’ cannot doubt, then the injunction, which, in this case, has plainly been violated by the Corporation, as a body, has just as plainly been violated by every member, who has given his individual assent to the corporate act, by which such violation was effected. That assent was given by the member now before us, Oscar W. Sturtevant. He has therefore, as an individual, violated the injunction, and having thus been guilty of the contempt with which he is charged, the attachment moved for must be issued against him, unless the order of this court, which he has disobeyed, was itself unlawful and void.
It is upon this ground alone that he has himself justified liis _ disobedience, and it is upon this ground alone, that he can be exempted from its punishment.
Before we proceed, however, to the discussion of the question whether the order of this court, from its total want óf júrisdiction, was illegal and void, there are some considerations hitherto unnoticed, to which it seems expedient to advert.
Hitherto we have passed over in silence an argument upon which the counsel for the defendants seemed to lay a peculiar stress—namely, that the injunction was not violated, at all, by the mere adoption of the resolution containing the grant to Jacob *490 Sharp and his associates, and, consequently, not violated by those by whose votes the resolution was passed.
The adoption of the resolution, it was said, was not a grant. It was merely an inchoate and initiatory act, which, but for the subsequent acceptance of the grantees, might have remained, for ever, ineffectual. Until this acceptance was executed and filed, no grant vfas made, no authority, right, or privilege given, and, consequently, until then, neither in its terms, nor in its spirit, was the injunction violated. This acceptance, however, was the act of persons to whom the injunction did not extend, and for whose acts, neither the Corporation nor its members, can be made responsible.
notwithstanding the apparent confidence with which this argument was urged, we find it difficult to believe that it was seriously meant to be pressed upon our adoption, since it could hardly have escaped the counsel that, with equal propriety and force, might the same argument be urged in every case in which a grant, transfer, or any disposition of property whatever, is forbidden to be made, either by a corporation, a partnership, or an individual. In no case, is a grant effectual by the mere will and act of the grantor. In every case,- it depends for its ultimate validity upon the assent and acceptance of the grantee. Hence, if the argument is valid, it follows that an injunction, which is meant to restrain a fraudulent or illegal grant, addressed only to the grantor, may be disregarded, in all cases, with entire impunity. You cannot punish the grantor, a fraudulent trustee or debtor, because the grant, which he executed and delivered, might have been rejected by the grantee, and but for his acceptance would have been wholly ineffectual. You cannot punish the grantee, for he was not named in the injunction.
The reply to the argument in the cases supposed, is exactly that which must be given in the present. The fraudulent trustee or debtor is forbidden to make the grant, with the intent that it shall be effectual, and in a mode, by which it may be rendered so; and when it is proved that he has done all that he could do to render the grant operative and valid, he is certainly and justly punished.
*491 So in the present case, the Common Council, and a majority of its members, have done all they could do to render the grant, they were forbidden to make, operative and effectual. They passed the resolution with the intent that it should operate as a grant, and in the confident expectation that, by its acceptance, it would become such. If they meant otherwise, they either should not have adopted the resolution at all, or, when they had passed it, should, as they might have done, have forbidden its acceptance. As the case stands, .they have made the grant which they were commanded absolutely to desist and refrain from making; and this grant, as they intended, by their permission and with their consent, has become absolute. Hence, if words have a meaning or the law an intention, they have violated the injunction both in its letter and in its spirit, and, I am constrained to add, they meant to violate it, and knew that they had done so.
We are told, however, that the members of the Common Council could not have acted otherwise than they did. Their charter bound them, it is said, to reconsider the resolution, and when reconsidered, it was not merely their' right, but their duty, to vote upon it, according to the dictates of their own conscience, and to punish them for the exercise of this right would be inj ustice and tyranny. The answer is brief and conclusive. The charter imposed upon them no such absolute duty as is asserted. When an ordinance or by-law is returned to the Common Council, we apprehend that its reconsideration depends, in all cases, upon the will of the majority; and assuredly, in the present case, they were not bound to reconsider the resolution, at the time, and in th‘e manner, they did. I add, that even upon a supposition that they were bound, by the provisions of their charter, to reconsider the resolution, they were equally bound, by the mandate of this court, to rescind and reject it, when reconsidered, if the order of the court was, in truth, issued, in the exercise of its proper jurisdiction.
I pass, therefore, to the last and most important objection that has been urged as conclusive against the present motion— the alleged want of jurisdiction in this or any court, to restrain the action of- the Common Council upon the subject before them, as was attempted by the injunction which they choose *492 to disregard. It was upon this allegation that the defence of the Common Council was mainly rested in the argument before us, and it is, exclusively, upon its truth that its members, in the first instance, elected to place their own justification of their conduct. The question which it involves has been perplexed by much extraneous reasoning and learning, and complicated with many considerations that do not at all belong to it; yet, if I mistake not, it is simple in its own nature, and, by no means, difficult of solution.
The true and only question is, whether from the total want of jurisdiction in this court over the subject matter to which the order of injunction related, the order was void, upon its face; for it is this defect of jurisdiction, and this alone, that has been or can be pretended to exist, and when it exists, it must, in all cases, be thus apparent. The injunction commanded the Corporation and its members to desist absolutely from the performance of certain specified acts, and, if this command could, under no circumstances, be rightfully addressed by a court of equity to a municipal corporation, the Common Council and its members, in the just maintenance oí their own rights, were bound to disregard it: but if it was a command that, under any circumstances, upon any grounds, and for any reason whatever, this court might impose upon the Common Council and its members, it was at their own peril that they refused to obey it. They had no right to regulate their conduct by their own opinion, or the opinion of their counsel, as to the truth or sufficiency of the allegations in the complaint, upon which the order addressed to them was founded. For the purpose of determining whether they would obey or disregard the injunction, they had no right to look into the complaint at all, and this, for the’ plain reason, that the jurisdiction of the court may be certain and undoubted, and yet the facts and allegations set forth in the complaint be wholly insufficient to warrant its exercise. When this insufficiency exists, there is a want of equity in the complaint, for which the injunction will be dissolved; but this want of equity is no evidence of a want of jurisdiction, that, rendering the process void, justifies disobedience. A party upon whom an injunction is served (they are the words of Chancellor Walworth *493 that I quote) is not permitted to speculate upon the future decision of the court as to the equity of the bill, and disobey the injunction, upon the ground that, upon the merits, it ought, not to have issued. (People v. Spalding, 2 Paige, 329; Sullivan, v. Judah, 4 Paige, 446.) I' add, that if there are any valid grounds in law, upon which the injunction, in a particular case, might have issued, although not one of the grounds may be stated in the complaint, the court has jurisdiction, and its order must be obeyed. It is erroneous, but certainly not void; and it is only a certain, a manifest invalidity, that can excuse and protect disobedience.
Although the want of equity and the want of jurisdiction (as was justly observed by the experienced and learned counsel who last addressed us) are frequently confounded, not only by text-writers, but by judges, yet the distinction, which separates them, is very reasonable and intelligible, as well as certain and established. This distinction, however, I cannot but think was, to a considerable extent, lost sight of in the arguments that were addressed to us on the part of the defendants, and it is this circumstance that rendered a large portion of the observations that were made, and authorities cited, wholly inapplicable to the true and only question now before us. It is, however, that question alone, as I shall again state it, that I mean to consider and discuss.
Was the order of this court, which, as an illegal exercise of power, was disregarded by the Common Council, void upon its face ?
The order commanded the Common Council not to grant to Jacob Sharp and others, or to any other person, the right, liberty, and privilege of laying down a double, or any other track, for a railway in Broadway.
At the time this injunction was obtained, a resolution, making such a grant to Jacob Sharp and others, was about' to be reconsidered by the Common Council, and, as the terms of the injunction embrace this resolution, and were, undoubtedly, meant to restrain its adoption, it is reasonable to construe the order exactly as it would be necessary to construe it, had it referred to and recited the resolution, and, by express words, had forbidden the Common Council to reconsider and adopt it. *494 It is this construction, therefore, that I adopt, and, for the purposes of this opinion, I shall treat the resolution as an ordinance or by-law, and its reconsideration and adoption as properly acts of legislation, in the fullest sense, in which the term, legislation, can be justly applied to the acts of a corporate body.
Making these concessions, the denial of the jurisdiction of this court amounts to this—that a court of equity, of general jurisdiction, has no power, in any case, or for any purpose, to restrain the legislative action of a municipal corporation, nor in any manner , to interfere with or control its legislative discretion, no matter to what subject the action may be directed, nor how manifest and gross the violation of law, even of the provisions of its own charter, that it may involve, and no matter by what motives of fear, partiality, or corruption, its discretion may be governed, nor how extensive and irreparable the mischief that, in the particular case, may be certain to result to individuals or the public, from its threatened exercise.
If this be true as a proposition of law, then the injunction order of this court, from the want of jurisdiction manifest on its face, was wholly void. If'the proposition be not true, the order was valid, and should have been obeyed.
In justice to the counsel for the defendants, it must be admitted that they shrank not from maintaining the truth of the proposition in all its extent, well perceiving that the necessity of their argument admitted no alternative, since to admit a single exception, was to admit the jurisdiction which they denied.
In reply to a question put by the court, it was expressly affirmed by one of the counsel that, should the Common Council attempt, by an ordinance, and from motives manifestly corrupt, to convey, for a grossly inadequate or merely nominal consideration, all the corporate property of the city, neither this, nor any other court, would ha've power to suppress, by an injunction, the meditated fraud; or when consummated, to rescind the grant, or punish its authors, or divest them of its fruits. There could be no remedy, we were told, but from the force of public opinion and the action of the people at an ensuing election, and all this, upon the ground, that neither the pro *495 priety, nor the honesty, of the proceedings of a legislative body, nor, while they are pending, even their legality, can ever he made a subject of judicial inquiry.
This, it must be confessed, is a startling doctrine. We all felt it to be so when announced, and I rejoice that we are now able to say, with an entire conviction, that, applied to a municipal corporation, it is just as groundless in law, as it seems to us, it is wrong in its principle, and certainly would he pernicious in its effects.
The doctrine, exactly as stated, may be true when applied to the legislature of the state, which, as a co-ordinate branch of the government, representing and exercising, in its sphere, the sovereignty of the people, is, for political reasons, of manifest force, wholly exempt in all its proceedings from any legal process or judicial control; but the doctrine is not, nor is any portion of it true, when applied to a subordinate municipal body, which, although clothed to some extent with legislative, and even political, powers, is yet, in the exercise of all its powers, just as subject to the authority and control of courts of justice, to legal process, legal restraint, and legal correction, as any other body or person, natural or artificial.
The supposition that there exists an important distinction, or any distinction whatever, between a municipal corporation and any other corporation aggregate, in respect to the powers of courts of justice over its proceedings, is tentirely gratuitous, and as it seems to me, is as destitute of reason, as it certainly is, of authority. The counsel could refer us to no case, nor have we found any, in which the judgment of the court has proceeded upon such a distinction, nor, in our researches, which have not been limited, have we been able to discover, that, by any judge or jurist, the existence of such a distinction, has ever been asserted or intimated. Were it otherwise—had such decisions been found in the English reports, or in those of our sister states—had it been proved that in England or in other states the supposed distinction is the established law, we should still be compelled to say that it is a law, which we must refuse to follow, for the plain reason, that it is directly inconsistent with the paramount authority of our own constitution. The constitution of the state declares that “ all *496 corporations shall have the right to sue, and shall be subject to be sued, in all courts, in like cases, as natural persons.” (Con. art. 8, sec. 3.) There is no exception here of municipal corporations, and an exception which the constitution has not made, we have neither the inclination, nor the power, to make ourselves.
A corporation subject to be sued, is necessarily subject to every process or order that, in the commencement, or in the progress, of. the suit may be necessary to, or be connected with, the relief which is demanded. And the words “ in the like cases,” plainly mean, “ for the like acts or omissions, and for the like reasons.”
Rejecting, then, an imaginary distinction, the question as to the validity of the only defence which the members of the Common Council have set up in their own behalf, and on which their counsel have chiefly relied, their entire exemption from judicial control, in every proceeding, that they may choose to clothe with the forms of legislation, is seen to possess a far deeper and wider importance than could, at first, have been imagined. If the members of the Common Council are entitled to the immunity which they claim, exactly the same immunity, and exactly upon the same grounds, may be claimed, and justly claimed by all, who manage officially the concerns of any and every corporation in the city or state, the directors, managers, or trustees of every bank, insurance, or trust company, and even of every public library, or hospital, dispensary, or savings bank. They have all, legislative powers, in the same sense as the Common Council, powers not indeed as extensive in their operation, and not therefore as liable to be abused, nor as dangerous when abused, but just as legislative and discretionary in their nature. They all have the power of making by-laws for the regulation of their affairs and binding on their members, and they may all give the form of a bylaw or resolution to any illegal or fraudulent proceeding into which they may be tempted or betrayed; and when, in compliance with the prayer of stockholders or creditors, or of any whose rights and interests they are about to sacrifice, a court of equity attempts, by an injunction, to restrain the proceeding, they may all, with the same propriety as the members of *497 the Common Council, defy the mandate, and denounce the attempt, as an unwarranted and unprecedented stretch of judicial power.
Notwithstanding these observations, the question still remains, has this court, or any court of equity, the power to interfere with the legislative discretion of the Common Council of this city, or of any other municipal corporation ? And to this question I at once reply, certainly not, if the term discretion be properly limited and understood; and thus understood, I carry the proposition much further than the counsel who advanced it. This court has no right to interfere with and control the exercise, not merely of the legislative, but of any other discretionary power, that the law has vested in the Corporation of the city; and, hence, I deem it quite immaterial, whether the resolution in favor of Jacob Sharp and his associates be termed a by-law, a grant, or a contract, or whether the power exercised in passing it be termed legislative, judicial, or executive; for if the Corporation had the power of granting, at all, the extraordinary privileges which the resolution confers, the propriety of exercising the power, and, perhaps, even the form of its exercise, rested entirely in its discretion. Nor is this all. A comí; of equity has no right to interfere with and control, in any case, the exercise of a discretionary power, no matter in whom it may be vested—a corporate body or individuals, the aldermen of a city, the directors of a bank, a trustee, executor, or guardian ; and I add, that the meaning and principle of the rule, and the limitations to which it is subject, are, in all the cases to which it applies, exactly the same. The meaning and principle of the rule are,- that the court will not substitute its own judgment for that of the party in whom the discretion is vested, and thus assume to itself a power which the law had given to another; and the limitations to which it is subject, are, that the discretion must be exercised, within its proper limits, for the purposes for which it was given, and from the motives, by which alone those who gave the discretion, intended that its exercise should be governed. I select, for the purpose of illustration, a single case; The directors of a bank have a large discretion in making dividends, in appointing its officers, and *498 in fixing the amount of their salaries; and in the exercise of this discretion, a court of equity, in the just application of the rule that has been stated, has certainly no right to control them. It has no right to say what dividends shall be made, what officers be appointed, or what salaries be allowed. But should the directors attempt to make a dividend of capital, instead of profits, or to raise the salaries to a sum so exorbitant as to equal or exceed the annual profits of the company; or in the case last supposed, by a secret compact, secure to themselves a large proportion of the aggregate sum allowed nominally as a compensation to others, it cannot for a moment be doubted, that a court of equity would be bound, upon the application of-creditors or stockholders, to restrain or annul, according to the circumstances of the particular case, the illegal, unjust, or fraudulent act. The act, in the first case, would be an excess of power; in the second, an abuse of discretion, and from its manifest prejudice to the stockholders, a breach of trust; in the last, a scandalous fraudand, to the mind of an equity lawyer, it would be an absurd and monstrous supposition, that, in either of the cases, the directors, by giving to the proceeding the form of a resolution of the board, or by any other device, could evade the jurisdiction of the court, and enable themselves, with impunity, to set its mandates at defiance.
The conclusion from these remarks is, that a court of equity' will not interfere to control the exercise of a discretionary power, when the discretion is legally and honestly exercised— and it has no reason to believe the fact is otherwise—but will interfere, whenever it has" grounds for believing that its interference is necessary to prevent abuse, injustice, or oppression, the violation of a trust, or the consummation of a fraud. It will interfere—and it is bound to interfere—whenever it has reason to believe that those in whom the discretion is vested, are prepared-illegally, wantonly, or corruptly, to trample upon rights, and sacrifice interests, which they are specially bound to watch over and protect.
Having stated these principles, the discussion may be regarded as closed, since the application of the principles to the case before us, is obvious and decisive. I shall therefore con *499 tent myself with referring to a few of the authorities by which they are sustained^ and then proceed to apply them to .the facts of the case.
The doctrine which, when stated in a condensed form, may be extracted from the decision of Lord Eldon in the leading case of Agar v. The Regent's Canal Company (Cooper’s Eq. Cas. 77), is, that whenever a corporation is about to exceed its powers, and apply its funds or credit to some object beyond its authority, and whenever the purpose of the corporation, if carried out, would constitute a breach of trust, a court of equity cannot refuse to interfere and give relief by an injunction; and his lordship said that this was a most wholesome exercise of jurisdiction, since it would be most prejudicial to the interests of all with whose property the managers of a corporation might choose to interfere, if there were not a jurisdiction continually open and ready to exercise its power to keep them within their legitimate limits. In the case of the River Dun Navigation Company v. North Midland Railway Company (1 Railway Cases, 135), it was upon the same doctrine that Lord Cottenham—a judge scarcely inferior to Lord Eldon in judgment, learning^ and research-—-placed the exercise of a jurisdiction, which he declared himself not at liberty to withhold. The case of Frewin v. Lewis (4 Mylne & Craig, 249) is one of those upon which the counsel for the defendants placed a strong reliance, for it was in this case that Lord Cottenham dissolved an injunction against the Poor Law Commissioners, upon the ground that its continuance would operate as an undue restraint upon the legal discretion of those important public functionaries ; yet, in this very case, his lordship was careful to assert and maintain the rightful jurisdiction of his court, and said, “ that when public functionaries are departing from the powers which' the law has vested in them, and are assuming a power which does not belong to them, this court no longer considers them as acting under their commission, but treats them, whether a corporation or individuals, as persons dealing with property without legal rightsand he added, “ that when such persons infringe of violate the rights of others, they become, like all other individuals, amenable to the jurisdiction of this court by injunction.” The force and application of this language will be *500 fully understood, when we remember that the powers of the Poor Law Commissioners are legislative, discretionary, and political, even in a more extensive sense than those of our own Corporation. I refer, lastly, to the three cases of the Attorney General v. Aspinall (2 M. & C. 613), Same v. Corporation of York (4 M. & C. 30), and the Same v. Mayor of Dublin, (2 Bligh. N. R. 312), as proving that when property held by a municipal corporation is clothed with public duties, or the objects to which it must be appropriated or applied are defined by law, there arises a trust, the violation of which a court of equity has, not merely the power, but is bound, to prevent by an injunction.
The streets of this city, we are told, are the property of the Corporation, in which the fee is vested; hut it is certain that this property is clothed with public duties, and that the objects to which alone it can be appropriated or applied, are strictly defined by law. Hence, according to the cases last cited, there is a trust in relation to the streets, the performance of which, a court of equity is competent to enforce by a decree, and, consequently, the violation of which, when threatened, it is bound to prevent by an injunction.
We are now in a condition to answer very' decisively the question proposed—Was the injunction order directed to the Corporation void upon its face, from the total want of jurisdiction in the court by which it was issued ? And the answer is that assuredly it was not, if there is any ground whatever upon which this court could lawfully restrain the Corporation from making the grant which the order described; and that there are many grounds upon which the restraint could be legally and justly imposed, we deem it no longer reasonable to doubt.
A few I shall now state :—
1. It may be that the Corporation has no power whatever either to establish itself, or to grant to others, the privilege of establishing a railway in any of the public streets in the city; and whether they have or not, is a question of law, which belongs not to the Corporation, but to courts of justice to decide; and until the decision, the exercise of the power may and ought to be restrained.
2. It may be that the establishment of a railway in Broadway would operate as an injurious monopoly, debarring the *501 bulk of our citizens of the beneficial use and enjoyment of the street, and securing them almost exclusively to the grantees of the Corporation. The creation of such a monopoly would not only be an excess of authority, but a breach of trust, which may and ought to be prevented by an injunction.
3. It may be that the building of a railway in Broadway— from the inconvenience and discomforts it would create to citizens generally, and its special injury to the inhabitants—would be a public nuisance. To prevent the creation of a nuisance, no matter by whom created, is not only within the jurisdiction of the court, but, upon proper allegations in a complaint, its positive duty. The mode of relief is an injunction.
4. It may be that the 'Common Council intended, from motives of partiality or corruption, to make the grant to Jacob Sharp and his associates, upon terms far less beneficial than could certainly have been obtained from others, thus defrauding the treasury of the city, and imposing a heavy and unnecessary burden upon its tax-paying inhabitants. In such a case, to issue an injunction, forbidding the grant, is not to interfere with a legal discretion, but to prevent a flagrant breach of trust and the completion of an extensive fraud.
I have already said that, in considering the question before us it is quite immaterial whether all or any of these grounds of jurisdiction and relief are alleged in the complaint, since the omission would only prove a want of equity in the complaint, not, at all, of jurisdiction in the court; but it so happens that all of them, are alleged in the complaint; and so distinctly and fully alleged, that the judge, who issued the order of injunction, would have failed in his duty had he refused to grant it. Upon such a complaint he had no liberty of refusal. It is possible, as the counsel for the defendants have insisted, that all the material allegations in the complaint are groundless or untenable, and that hereafter we may ourselves be satisfied that they are so, but I shall not now express or intimate any opinion upon questions, that can only be properly discussed and considered upon a motion to dissolve the injunction, or upon the final hearing.
The conclusion at which I have arrived, and which necessarily follows from the observations that I have made, is, that *502 the order of injunction, which Alderman Sturtevant refused to obey, was a valid exercise of the established jurisdiction of this court, and, consequently, that no adequate cause has been shown why an attachment should not issue against him for the contempt," of which, from the papers before us, he appears to have been guilty. In this conclusion all the judges who assisted me—by each of whom, separately-, all the questions in “ the case have been carefully examined—entirely concur.
The motion for an attachment is therefore granted.
Bosworth, J.
The plaintiffs move for an attachment against Oscar W. Sturtevant, one of the aldermen of the city, to arrest him for a contempt of court, in disobeying an injunction order made in this action by a judge of this court, on .the 27th of December,' 1852.
Having, with others óf my brethren, at the request of the judge holding the special term at which the motion was made, heard the arguments of counsel for and- against the motion, I shall, as briefly as practicable* state some of the views formed upon a consideration of the propositions argued and authorities cited. ' '
To present these intelligibly, it is necessary to state some of the prominent facts of the case. (The learned judge here recapitulated the material- facts as set forth and averred in the complaint, and then proceeded as follows:—) •
The judge to whom application was made for the injunction order, granted it on a verified complaint stating these facts to be truei Whether true orzfalse is a question which we are not called upon to determine on this proceeding. To determine whether he had any jurisdiction to make the order, the complaint alone can be looked at, and everything contained in it and stated to be true in fact, must be fleemed to be true for all the purposes of the question before us. It was on the facts stated in the complaint, and those only, that the order was made. If the judge, on those facts, had jurisdiction to make the order, it was the duty of those to whom it was directed to obey it, until they had procured it to be vacated. If he had jurisdiction to make the order, it is incontestable that it was his duty to make it, if the facts stated in the complaint are true.
*503 According to the allegations in the complaint, the Common Council, against the objections of the .mayor, were about to grant to Jacob Sharp and others, authority and power to construct and use a railway in Broadway, with liberty to charge each passenger five cents fare, on payment to the city of a license fee for each cár run of only $20 per annum, while others stood ready to take the grant, and construct such a railway, and run cars with equal accommodations, and charge only three cents fare, and pay a license fee of $1,000 per annum.,
As between two such propositions, there can be no pretence for saying that in the exercise of an honest discretion the former might be preferred to the latter. It is not a debatable question whether a license* fee of $1,000 per car per annum is more advantageous to the city than one of $20, nor whether the interests of the community will be better subserved by each citizen being compelled to pay a fare of three cents, instead of five. Therefore, even if it can be successfully maintained, that the Common Council had the power to make the grant which the resolutions purport to make, it would be a gross abuse of power, and a flagrant violation of public duty, to make the grant' as it was made, instead of making it to those who would pay, at the least, an additional million of dollars for it into the public treasury, and exact from the passengers only three cents fare, instead of five. Is it incontestable that such an abuse of power and violation of duty cannot be restrained by any court?
It must be conceded that this Corporation is liable to be sued, that the plaintiffs have capacity to sue, and that this court has power to make the order in question, if any court had power to make it, on the facts stated in this complaint. It is undeniable, that, if any jurisdiction can be exercised, the acts contemplated by the defendants are such as they may properly be restrained by injunction from doing.
If the facts stated in the complaint are true, the Common ■ Council were intending, so far as they possessed power to accomplish the purpose, to grant to an association of individuals the right of appropriating to their exclusive use, to a certain extent, a portion of the centre of the main street of the city, and, to the same extent, to deprive all other inhabitants pf the *504 city of the right and privilege previously enjoyed by them of the free and common use of the whole of the carnage way of said street. They were about to make a grant authorizing the grantees to impose a charge or tax of five cents on every inhabitant who should ride in their cars, while others offered to construct a road in the same manner, and charge only three cents fare, and in addition to this pay into the treasury from §100,000 to $200,000 per annum, or $1,000 per car.
The part of the charter or of any legislative act authorizing this to be done has not been pointed out. To make such a grant under such circumstances, even if the power exists to make any grant for the construction of a railway on the ground of its being “ deemed good, useful, or necessary for the good rule and government of the body corporate,” or with a view to public convenience, would be a clear abuse of power and violation of duty.
Ho one can pretend that it would promote public convenience, or tend to the good rule and government of the body politic, to compel every citizen to pay five cents fare, instead of three,, or that the public treasury should be permitted to receive only $20 instead of $1,000 per annum for every car run.
In Frewin v. Lewis (4 Mylne & Craig, 249), the defendants were the Poor Law Commissioners and the guardians of the Holborn Union, under the poor law amendment act. (4 and 5 Will. IV. 76.) Lord Cottenham, in speaking of the jurisdiction of the court over bodies constituted like the poor law commissioners, says that, “ If they are assuming to themselves a power over property which the law does not give them, this court no longer considers them as acting under the authority of their commission, but treats them, whether they be a corporation or individuals, merely as persons dealing with property without legal authority.” * * * “ And if, under pretence of an authority which the law does give them to a certain extent, they go beyond the line of their authority, and infringe or violate the rights of others, they become, like all other individuals, amenable to the jurisdiction of this court by injunction.”
Is it not clearly going beyond the line of any authority *505 vested in the Common Council to deliberately subject every inhabitant of the city to the necessity of paying five cents every time he may ride on the proposed railway, when others will construct the road in the same manner, and with the same accommodations, and charge only three cents ? Is there any lawful authority to unnecessarily tax the whole body of the people? Can a two cent tax be imposed upon each citizen every time he may pass up and down Broadway, from mere caprice, without any assignable cause, and under the power conferred to pitch, pave, regulate, widen, or alter the street ?
In the case of the Attorney General against Forbes, the bill was filed in the name of the Attorney General, at the relation of Thomas Tindale, treasurer, and by the relator on behalf of himself and all other of the inhabitants of the county of Bucks (2 Mylne & Craig, 123). The court, in speaking of the question of parties, as well as of its jurisdiction, remarked, that “ in informations and proceedings for the purpose of preventing public nuisances, the ordinary course is for the Attorney General to take it on himself to sue, as representing the public; but it is equally certain that individuals who.conceive themselves aggrieved may come forward and ask the assistance of the court to prevent a public nuisance, from which they have individually sustained damage.”
I can perceive no good reason why a court should not restrain a municipal corporation as well from infringing the public franchise, in a case presenting an unquestionable abuse of power, to the prejudice of individuals and the whole body politic, as from granting mere property to a particular association of individuals, where others stand ready and offer to pay double the price for the same property.
Municipal corporations possess only such powers as are specifically granted by the act of incorporation, and such as are necessary to carry into effect the powers expressly granted. In the appropriation of the funds of the people, they are creatures of limited powers; and when they attempt to appropriate the public funds to purposes not authorized by the charter or by positive law, whether it be done by resolution, ordinance, or under the form of legislation, their act is without authority and *506 void. (Hodges v. City of Buffalo, 2 Denio, 140; Halstead v. The Mayor of New York, 3 Coms. 430.)
An attempt to sell to certain persons the public wharves, piers, and slips, or to lease them for a term of years for a fourth or a tenth of what others offered, and were able to pay, would be a clear abuse of power, and a gross fraud upon the public, which ought to be restrained. If any doubt should be felt whether such an interposition of the court would not be going further than was evidenced by any reported case, none could be entertained that it would not be going further than the prevention of fraud and the protection of the public required; and if the action invoked could not be rested on any better principle, it might be safely placed on the ground that “ fraud and damage, coupled together, entitle the injured party to relief in any court of justice.”
It is not intended to deny the proposition, that where the exercise of discretion is confided to persons appointed by law, or to a municipal corporation, a court will not attempt to control the exercise of that discretion. But if, under pretence of exercising the discretionary powers thus delegated, they threaten, and are about to do, what is undeniably a gross abuse of power, to the injury, and in fraud of those for whose benefit these delegated powers are to be exercised, and to the injury, and in fraud of the rights of individuals and the public, I know of no principle or case which precludes the interference of the court to prevent the threatened injury. (Oswego Falls Bridge Company v. Fish, 1 Barb. Ch. 547; The Attorney General v. Mayor, &c., of Mobile, 5 Port. 279; The Attorney General v. The Great Northern Railway Company, 3 L. & E. 263; Munt v. Shrewsbury and Chester Railway Company, id. 144; Waterman’s Eden on Injunction, vol. ii., p. 259, and,notes.)
Assuming, but not conceding, the authority of the Common Council to consider whether it was expedient to grant authority to construct a railway in Broadway on any terms—on which point no opinion is intended to be expressed—it is absurd to insist that, as between two sets of applicants, equally reputable and able, and offering to accept a grant on the same terms, as far as the mode and manner of constructing the road and of *507 furnishing and running cars are concerned, there is any pretence for saying that, in the exercise of an honest or intelligent discretion, the grant may he made to one set of applicants, and allow them to charge five cents fare, instead of making it to another set of applicants, who would take it with a prohibition against charging more than three cents fare.
It would be a remarkable abuse of power and violation of duty to make a grant interfering with the right of every citizen to the common and unobstructed use of the street as a highway, and appropriating it in part to the exclusive use and personal emolument of the grantees, and confer on them power to tax every inhabitant of the city and State five cents for riding in the cars, when others would take the grant, and furnish the same accommodations to the public, with power to charge only three cents fare.
If such an abuse of power and breach of trust cannot be restrained, then the making of the grant could not have been restrained, if the purpose had existed and been avowed, to make it for the nominal consideration of one dollar.
That it may be restrained, is incontestable, as I think, both upon principle and authority.
The only serious question, upon the facts of any case that may be presented, is, whether the suit should be instituted in the name of some one representing the whole people, or whether it may be brought in the name of an individual. That a suit may be instituted in the name of an individual to restrain a public nuisance, when it occasions special injury to the plaintiff beyond that which the community suffers in common with him, is expressly affirmed in the Attorney General v. Forbes, and has been repeatedly decided in reported cases (6 J. Ch. 439; Corning v. Lansing, 8 Simons, 193; Spencer v. London and Birmingham Railroad Company, Id. 272; Sampson v. Smith, Story’s Equity, vol. ii., s. 934; State of Pennsylvania v. Wheeling Bridge Company, 13 How. Sup. C. R. 566, 576, 608).
In this case the complaint alleged facts which, it is claimed, establish the position, that the construction of this railway would be a special injury to them and other owners of property situate on Broadway. On these facts, the judge who made the order was required, and it became his duty, to exercise. Ms *508 judgment and determine whether this claim was well founded. Whether he decided wisely or not, is wholly foreign to the question of his jurisdiction. If he decided erroneously, the proper course of the defendants was to apply to him to vacate the order.
If the alleged facts stated inffhe complaint were untrue; if they placed the intended action of the Common Council and their motives with respect to it, in an aspect grossly unjust to them, and if the allegations in the complaint were a fraud upon the court, the appropriate course was to show this by affidavit, and move for a summary discharge of the order, and for such action against the plaintiffs as such conduct would make it the duty of the court to take. The remarks made by the court in Noe v. Gibson, 7 Paige 513, and in Russell v. East Anglian, Railway Company, 1 L. and Eq. R. 101, are applicable to the duty of the defendants in this case. In the latter case, the court said:—“ I know of no act of this court which may not be questioned in a proper form, and on a proper' application; but I think it is not competent for any one to interfere with the possession of a receiver, to disobey an injunction, or to disobey any other order of the court, on the ground that such orders were improvidently made—they must take a proper course to question them, but while they exist they must obey them; I consider the rule to be of such importance to the interests of .the public, to the peace and safety of the public, and to the administration of the justice of this court, that it is a rule I shall hold inflexible on all occasions” (p. 106). “ This court has to maintain its authority for the benefit of the public, and it can only do that, as I have before said, by supporting its officers in the execution of the orders and processes of the court, and not allowing disobedience and resistance to be the mode of questioning the propriety of the exercise of the discretion of this court” (p. 119).
I shall but briefly notice a few of the many other points' argued or suggested.
These resolutions are, in no proper sense of the term, a legislative act; they are, in substance and effect, a contract, by which certain rights and privileges are granted to the associators upon certain terms and conditions, and for a stipulated *509 compensation, to the exclusion of all others. It depends entirely upon their mil whether any new members shall be let into the association, and upon what terms. If any of the clauses of the resolutions partake of a legislative or by-law character, they are few and unimportant, compared with those which relate to matters purely of contract. The injunction order, by its fair meaning, prohibited the .Common Council from granting to Sharp and others, the right or privilege, or in any manner authorizing them, to construct any railway in Broadway.
When the resolutions were passed the grant was made, and the authority was given. Nothing more was to be done, or could be done, by them. It only remained to be seen whether the grantees would file their written acceptance, agreeing to conform thereto. This was immediately filed. Assuming that the act is revocable, it is enough to say, that instead of there being a purpose manifested to revoke it, it was committed against the objections of the mayor, in defiance of the injunction, and resolutions were passed rebuking the judge who made the order for attempting to restrain the doing of the act.
I tbink there is no just ground for saying that the injunction did not prohibit the acts subsequently done, and certainly none for saying, as the case now stands, that it was not understood as being a direct and positive prohibition against doing what was in fact done.
If it be assumed that the resolutions would confer no authority to take up the pavement and construct a railway, and that all who should undertake to act under such authority would be wrong-doers, an injunction restraining them from doing such acts would not be void. That is the only proceeding which could prevent the necessity of a multiplicity of suits, and in actions sounding merely in damages, it is obvious that no adequate redress could be obtained.
It was only by the members of the Common Council that the inhibited grant could be made. It was by their acts only that the injunction could be violated. A corporation acts only by its officers and agents. When enjoined from doing anything, and the injunction is disobeyed, the disobedience is not the act of the intangible and impalpable statutory being bearing the *510 corporate name, but of the individuals by whom it acts. Process is served on a corporation by serving it on some of its principal officers, which service is a good commencement of a suit against it. And an order which restrains a corporation from doing an act restrains every officer of it from doing the thing prohibited; and if be does the act knowing that an order has been made prohibiting it, he is chargeable with the consequences of a deliberate violation of an order of the court.
If violated, it is by the officer or agent who performs the prohibited agt. If the officers cannot be punished, no one can be., The idea of sequestering the property of a municipal corporation for disobeying an order prohibiting it from doing acts highly injurious to every citizen of the body politic, with a view to compensate those citizens for the injuries thus inflicted, is not intelligible. It is taxing them to pay losses occasioned by a breach of trust committed by those intrusted with exercising the taxing power for their benefit. First every inhabitant of the city is injured,—and, by way of compensation, those who inflicted the injury tax them to its full amount to remunerate them for the loss.
The statute provides that not only “ parties to suits ” may be punished for any “disobedience to any lawful order, decree, or process ” of the court, but that “ all other persons ” may be. (2 R. S. 534, s. 1, sub. 1, 3, and 8.) It is laid down in books of practice, that, as “an injunction to restrain waste, &c., is usually directed to the party, his servants, workmen, and agents, consequently, if his servants, workmen, or agents, having had notice of the injunction, do anything inhibited by it, they will be guilty of a contempt.” (1 Barb. Ch. p. 634, and notes.) This rule is in terms only of the equivalent import with the third subdivision of the section of the statute above cited. It is also laid down as settled practice, that, so far as the question of liability to punishment for a contempt of coiirt is concerned, it is enough that the party has actually notice of it, although it may not have been regularly served on him. (1 Barb. Ch. pr. 693, notes 1, m, n, and o, and cases there cited.) McNeil v. Garrat, 1 Young & Coll. 97, is a recent. authority to that effect. Matthews v. Smith, 3 Hare, 331, is an authority that a party obtaining the injunction may be punished for pub- *511 listing a notice respecting it, which misrepresents the relative position or character of any of the parties to the cause. In ex parte Van Sandau, 1 Phillips, 445, a publication speaking in less severe and disrespectful terms of the judgment of the court than the rebuking resolutions did of the injunction order made in this action, was characterized by Lord Oottenham as “ a gross contempt of the court.” Lord Hardwick, in a case of the “ General Evening Post,” 2 Atk. 469, in enumerating the different kinds of contempts, states, as one distinct head of contempt, the “ scandalizing of the court.” Such an act falls clearly within the spirit, if not the very letter, of 2 R. S. § 10, sub. 6 ; id. 535, § 1, sub. 8; 2 Daniels, Ch. R. 1277; 5 Price, 518; Waterman’s Eden on Injunction, p. 94 to 102-2.
The effect of not serving with the injunction order a copy of the affidavit on which it is granted, is, that a defendant may procure the order to be set aside for irregularity. (2 Paige, 394.) •
An injunction order regularly granted, of which a party has knowledge, cannot be treated as a nullity, and violated with t impunity, before the party obtaining it, in the exercise of due diligence, is able do serve it, nor after it has been served, because the service was not in all respects perfectly regular, where there is no pretence that the person or party disobeying it have not had full and accurate information of the acts forbidden by it. ■
I am of the opinion that no objection, either of form or substance, has been presented which can exonerate Mr. Sturtevant from the consequences of a deliberate and marked disobedience of the order, or which could furnish a respectable apology for the court for omitting to take such notice of it as is due to the interests of the public, and to a proper administration of justice in behalf of parties to suits, and of the whole community.
Motions for attachment without further argument were then granted against the following aldermen,—Abraham Moore, Dudley Haléy, Jacob F. Oakley, Thomas J. Barr, William M. Tweed, Richard T. Compton, William. J. Brisley, Wesley Smith, James M. Bard, Asahel A. Denman, William H. Coryell, John Doherty, and William J. Peck; and against the following *512 assistant aldermen,—Josiah W. Brown, Samuel R. Mabbatt, Timothy O’Brien, John F. Rodman, Patrick Breaden, Charles H. Ring, Helmus M. Wells, Edwin Bouton, William H. Wright, Jacob H. Valentine, William McConkey, Joseph Rogers, and Thomas Wheelan.