## SUPREME COURT.

### Lorenzo B. Shepard agt. Fernando Wood and others.

Any *tax-payer*, on behalf of himself and other tax-payers, may ask the interposition of the court by injunction, upon a proper case·

1st. Whenever his or their interests are likely to be injuriously affected by *any person or corporation, or other body of persons*, acting, or pretending to act by lawful authority, when they assume power over property which the law does not give them.

2d. When they go beyond the line of their authority, and infringe or violate the rights of others.

3d. When they attempt to, or are about to exceed their powers by levying a tax.

4th. When by misapplying their funds, or by applying their funds, or their own credit, to an object beyond their authority; and,

5th. Whenever the purpose of such a body, if carried out, would constitute a breach of the law, or of their duty.

The power of taxing the people and their property, is with the legislature of the state. The tax must be imposed, and the means to collect it given by the laws; they must fix the amount to be collected, and define the mode in which it shall be rated, and the things subjected to it.

Whether the legislature have the power to delegate this authority to another body. *Quere?*

The mayor, recorder and aldermen of the city of New-York are declared by law to be the *supervisors* of the city and county of New-York; and they have the same powers only as those conferred upon the boards of supervisors in the different counties of the state.

There is no power conferred by the general law regulating the powers of boards of supervisors, which would authorize the board of supervisors for the city and county of New-York to impose a tax of $200,000 on its citizens, to be paid to the commissioners for the improvement of the Central Park, in said

Shepard agt. Wood and others.

city. Nor is there any authority conferred upon said board of supervisors to levy such tax by any of the statutes relating to the Central Park.

The first section of the act of April 12, 1856, (*Sess. L.* 271,) authorizing a tax of about $5,000,000, declares "that the board of supervisors of the city and county of New-York, are hereby empowered, as soon as conveniently may be after the passage of this act, to order and cause to be raised by tax on the estates, real and personal, subject to taxation according to law, not exceeding $3,247,189 for *the object* and purposes," (particularly specified in the act) "and for such other *expenses* as the *mayor aldermen and commonalty* may be put to by law."

The latter clause of this section sustains no other meaning than the power to *expend*—and that not to the defendants, (supervisors, or Central Park commissioners,) but to another and a different *corporation*—the corporation of the city of New-York.

It is very doubtful whether the legislature have the unlimited right to clothe any subordinate body of men with *power to tax* without limit, and to expend at pleasure, without responsibility and without control—all which, it seems, is claimed by the defendants in this case under the act of April, 1856.

The subject of taxation, in reference to the city of New-York and the state, considered.

### *New-York Special Term, Aug.,* 1856.

THE plaintiff, who is the counsel of the corporation of the city of New-York, and head of one of the departments of the city government, in his individual capacity, and *as one of the tax-payers, as well on his own behalf as on behalf of all other corporators and tax-payers of this city, who may be affected by the subject of his complaint, complains that the defendant and his associates, who compose the board of supervisors of the city and county of New-York, did, on the application of certain persons, who claim to be commissioners of the Central Park, on the 11th day of June last,

"*Resolve,* That there shall be raised by tax on the estates, real and personal, of the freeholders, inhabitants and non-residents, assessed according to law, the sum of $200,000 for the improvement of the Central Park, the same to be expended under the direction of the commissioners of said Park."

That the said resolution was passed by a vote of fourteen in the affirmative and eight in the negative of said board of supervisors, and thus they threaten, or are about to pass further resolutions ordering and directing the comptroller to insert that sum

in the tax levy and warrant for the collection of the taxes of said city, in addition to the sum of $3,247,189, which the supervisors are empowered, by the act of April 12, 1856, to order to be raised.

That the supervisors claim, not only the power to levy and collect said tax, but authority to permit the same to be expended under the direction of Fernando Wood and Joseph S. Taylor, commissioners of the Central Park; and the plaintiff alleges that he is apprehensive that such resolution may be carried into effect, and prays for an injunction that the resolution may be declared void, and the injunction be made perpetual.

LORENZO B. SHEPARD, *plaintiff, in person.*

WHITING, Justice. When this complaint was presented to me, I granted a temporary injunction, and an order upon the defendants to show cause why it should not be continued until the final hearing.

I confess, I was at the time impressed with an idea that the majority of the board of supervisors would be able to show some semblance of authority on their part to uphold such a resolution, or that they would not have attempted to exercise so delicate and important a power.

If successful in adding that amount to the sum authorized to be raised by the legislature of the state, it might have jeoparded the collection of the legal tax.

With a city already burdened with sixteen millions of debt, with legislative authority to the board of supervisors to raise by tax about seven millions of dollars for the year 1856, the addition of such a sum upon the already overburdened tax-payers required, if unauthorized by law, the exercise of intellects sufficiently vigorous to declare, in the face of a free people, that the end should justify the means in the exercise of a doubtful power.

The calamitous consequences to the city in the loss of its credit, to arise out of its inability to meet its engagements by

. reason of its failure to collect the legal tax to defray the ordi-
nary expenses of the government, should have induced the
majority of the board of supervisors to have looked at the con-
sequences to follow their act.

If the public moneys can be easily taken out of the public
treasury, and squandered without a just responsibility; if a
year's appropriation can be withdrawn by irresponsible heads
of departments in six months, without a just accountability, it
is time that the tax-payers should know that their money can-
not be illegally taken from their pockets for any such purpose.

On the return day of the order, no person appeared on be-
half of the defendants to sustain this bold and startling reso-
lution.

My excuse for giving any reasons for continuing the injunc-
tion until the final hearing, must be found in the novelty of the
effort of the majority of this board of supervisors.

The time I have been able to devote to the question, has led
me to the conclusion that any tax-payer, on behalf of himself
and other tax-payers, may ask the interposition of this court
upon a proper case, whenever his or their interests are likely
to be injuriously affected by any person or corporation, or other
body of persons, acting or pretending to act by lawful authority,
when they assume power over property which the law does not
give them, when they go beyond the line of their authority, and
infringe or violate the rights of others, or when they attempt,
or are about to exceed their powers by levying a tax, or by
misapplying their funds, or by applying their funds or their own
credit to an object beyond their authority, whenever the pur-
pose of such a body, if carried out, would constitute a breach
of the law or of their duty—that the appropriate mode of relief
in any such case is by injunction.   The exercise of jurisdiction
in such case is wholesome, whenever it would be prejudicial to
the interests of all with whose property the managers of such a
power might choose to interfere; and it would be a strange
anomaly in the law if such a jurisdiction were not continually
open, and ready to exercise such a power to keep such bodies
within their legitimate limits. (*Agar* agt. *The Regent's Canal*

*Company, Cooper's Eq. Cases*, 77 ; *River Dun Navigation Company* agt. *Midland Railway Company*, 1 *Railway Cases*, 135 ; *Frewer* agt. *Lewis*, 4 *Mylne & Craig*, 249 ; *Attorney-General* agt. *Forbes*, 2 *Mylne & Craig*, 123 ; *Davis* agt. *The Mayor, &c.*, 1 *Duer*, 451 ; *Roosevelt* agt. *Varnum et al.*, 12 *How. Pr. R.* 469 ; *The Chemical Bank* agt. *The Mayor, &c., id.* 477.)

The power of taxing the people and their property is essential to the very existence of government. It may legitimately be exercised by every state on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of it is to be found, if anywhere, in the structure of the government itself. It exists in the power to make the laws. The legislature, in imposing it, acts upon its constituents. Here, it was supposed, lay the security against excessive taxation.

As the expenses of the state could not be limited, the people have not, in their fundamental law, prescribed any limit to the exercise of this right.

They have chosen to rest it, if not on the purity or patriotism, at least on the interest of the legislator, and on the influence of the constituents over the representative, to guard them against abuse.

The right to lay and collect a tax is inherent in, and one of the highest attributes of, the sovereignty of a state, and is co-extensive to that to which it is an incident. (*M'Cullough* agt. *The State of Maryland*, 4 *Wheaton*, 316 ; *Osgood* agt. *Blake*, 1 *Foster*, 562 ; *People ex rel. Griffin* agt. *The Mayor of Brooklyn*, 4 *Com.* 419.)

This power to make the laws is legislative. The tax must be imposed and the means to collect it given by the laws ; they must fix the amount to be collected, and define the mode in which it shall be rated, and the things subjected to it.

In accordance with this view of the subject, the legislature, with whom the taxing power exclusively belongs, has uniformly imposed them, and authorized and provided the means for their collection, from the earliest history of the state to the present time.

Whether they have the power to delegate this authority to another body, it is not now necessary to inquire. The question now is, have they authorized the board of supervisors to levy this tax of $200,000?

A board of supervisors is a *quasi* corporation. (*Jansen* agt. *Ostrander*, 6 *Cow.* 671.) They have no other, or more power than such as is given them by the statute which creates them; or such as may be conferred upon them by laws. (*Jackson* agt. *Hartwell*, 8 *Johns. R.* 422; *Jackson* agt. *Corry*, *id.* 385.)

The mayor, recorder and aldermen of the city of New-York are declared to be the supervisors of the city and county of New-York. (1 *R. S.*, 3*d ed.*, *p.* 22, § 32.)

The powers conferred upon this board, under the general law creating them, is the same as that conferred upon the board of supervisors in the different counties of this state. These are,

1. To make such orders as they may deem expedient concerning the corporate property.

2. To examine, settle and allow all accounts chargeable against the county, and to direct the raising of such sums as may be necessary to defray the same.

3. To audit the accounts of town officers and other persons against their respective towns, and to direct the raising of such sums as may be necessary to defray the same.

4. To perform any other duties which may be enjoined on them by any law of this state.

5. To cause to be levied, collected and paid to the treasurer of the county, such sums of money as may be necessary to construct and repair bridges therein, and to prescribe upon what plan, and in what manner, the moneys to be raised shall be expended.

6. To apportion the taxes to be raised among the several towns and wards of their county as shall seem to them to be equitable and just.

7. To cause to be levied, collected and paid all such sums of money as they shall deem necessary for rebuilding or repairing the court-house or jail of the county, or for building, rebuilding or repairing the clerk's office of the county, and to prescribe

upon what plan, and in what manner, the moneys so raised shall be expended.

8. To appoint special commissioners to lay out public highways.

These are, the general powers given. There are several others, of a special nature, to be exercised in a particular manner, and under certain restrictions, conditions and limitations.

There is no power conferred by the general law regulating the powers of this particular body, authorizing the imposition of the tax in question.

So far as I have been able to learn, the only authority claimed by the board of supervisors is what is given by the act of the legislature of April 12, 1856, authorizing a tax of about five millions of dollars. (*Sess. L. p.* 271.)

The first section of that act declares, " That the board of supervisors of the city and county of New-York are hereby empowered, as soon as conveniently may be after the passage of this act, to order and cause to be raised by tax on the estates, real and personal, subject to taxation according to law, not exceeding $3,247,189 for the object and purposes "—(particularly specified in the act)—" and for such other expenses as the mayor, aldermen and commonalty may be put to by law."

It is said that the board of supervisors claim, that under this latter clause they have the right to levy this tax.

I find no word therein conferring authority to levy a tax. These words only authorize the money which shall be raised under the authority of the act to be expended for the particular purposes named in the act, and for such other expenses as the corporation may be put to by law.

It is not necessary that I should express any opinion as to the meaning of this portion of the act. It is enough that we look in vain to it to sustain any other than the power to expend—and that not to the defendants, but to another and a different corporation.

It may be that if the commissioners should go on and incur a large expense to the city in improving the land taken for the Central Park, in pursuance of law, the common council may,

perhaps, out of any unexpended portion of the moneys thus raised, pay such expenses under the phraseology used in the act. But if the commissioners shall, without full and adequate authority, cause such an expenditure, they might be compelled to discharge the obligation out of their own pockets.

I have examined the several statutes relating to the Central Park, and find therein no warrant or authority for the levy of such a tax as this by the board of supervisors.

If the supervisors, in the assessment of a tax, exceed the sum authorized to be raised, or assess a tax for an object not within their corporate powers, or if they blend in one assessment an illegal tax with one that is legal, the whole is uncollectable. (*Huse* agt. *Merriam*, 2 *Greenleaf*, 375; *Elwell* agt. *Shaw*, 1 *id.* 339; *Thurston* agt. *Little*, 3 *Mass. R.* 429, 433; *Bangs* agt. *Snow*, 1 *Mass. R.* 181; *Dillingham* agt. *Snow*, 5 *Mass. R.* 547; *Stetson* agt. *Kempton*, 13 *Mass.* 272; *Libby* agt. *Burnham*, 15 *Mass.* 144; *Drew* agt. *Davis*, 10 *Ver.* `R.* 506; *Davis* agt. *Robertson*, 9 *New Hamp.* 524.)

Perhaps if the warrant of assessment distinguished the legal from the illegal part—that is, if the good could be, by the terms of the assessment and warrant, separated from the vicious—the valid part might be collected. (*Torry* agt. *Milbury*, 21 *Pick.* 24.)

How the supervisors intended to levy and collect it, does not precisely appear. It is alleged, however, in the complaint, that they were about to direct the comptroller to insert the amount in the tax list and warrant. If so, it would have been added to the general amount, and thus the whole would have been illegal. I have examined the form of the comptroller's warrant, and this would have been the inevitable result.

The power claimed is unlimited. If they can assess $200,-000 they can assess $2,000,000, or $10,000,000; and the citizens would thus be subjected, not to the unlimited power of the legislature, but to the unrestricted power of this board of supervisors.

This would vest in them authority upon a subject of the most vital importance to the citizens—the power of taking from them

their property by way of taxation, and enable them to bankrupt everybody.

If they can raise funds in this way, and spend it as they please upon this Park, they may raise and expend as much as they please upon any other grand scheme.

I am as yet not prepared to admit the unlimited right of the legislature to clothe any subordinate body of men with power to tax without limit, and to expend at pleasure, without responsibility and without control. All this, it seems, is claimed under the act of April, 1856.

The citizen is already borne down and oppressed with taxation, which, if continued, must be ruinous. If it shall continue to be done, our fancied freedom is an idle delusion.

" We could not suffer more under the sway of an Asiatic prince, whose will is law, and whose exactions are limited alone by his desires."

The last year's tax list of the state shows how this city shares in the burden of taxation adopted by the state and city governments.

Our island, which constitutes our city and county,

| | |
|---|---:|
| contains of land, acres - - - - - - - - | 13,920 |
| Population - - - - - - - - - - - - - - | 629,810 |
| Assessed value of real estate - - - - - - | $337,038,526 |
| Assessed value of personal estate - - - - - | 150,022,312 |
| Aggregate value - - - - - - - | $487,060,838 |

Our taxes were $5,844,772, of which $608,826.04 was paid to the state.

The whole tax for the remainder of the state, counties and towns, was but $5,833,243.

| | |
|---|---:|
| Excluding our city, the state has of land, acres | 28,046,678 |
| Population - - - - - - - - - - - - | 2,836,308 |
| Assessed value of real estate - - - - - | $770,234,189 |
| Assessed value of personal estate - - - - | 143,990,252 |
| Aggregate value - - - - - - - - | $914,224,441 |
| The amount of tax imposed - - - - - - | 1,144,755.13 |

So it is seen, that with a population of about six hundred and thirty thousand, we pay more taxes than the remainder of the whole state, with a population of nearly three millions.

We pay more than one-third of all the taxes of the state, and more than one-half the amount paid by all the other counties and towns.

Our fourteen thousand acres of land is valued at nearly one-third of the whole state, with its twenty-eight millions of acres, and the personal property of the county at more than one-half of all the rest of the state.

Thus are the burdens of taxation heaped upon the city. May not the modern philanthropists look here to find some of the reasons that lead to the erection of tenement houses, and to the squalid poverty that overtakes many who drag out a miserable existence in this city?

Writers upon political economy generally agree that the great burden of taxation falls upon the wages of labor. If this is so, it behooves the working man so to exercise his elective franchise in the selection of candidates for public office that his interests will be properly represented—such as will strive to put, and to keep down the enormous and unnecessary expenses of our city government within the limits of a just economy. If he shall do so, he will reap the superior benefits to arise from a good rather than the evils of a profligate government.

It is an error to suppose, as many do, that the land and pecuniary wealth of the people bear the burden of the administration of the government; it falls inevitably, by the stern rules of political ethics, upon productive labor.

The evidence of the more economical administration of public affairs, between this city and the country, is to be seen in the few statistics here furnished for reflection.

Perhaps it may be deemed by some that I have exceeded the limits of judicial duty in the disposition of this case, by alluding to subjects not within the sphere of the case presented for consideration. Deeming them, as I do, to be germain to the question involved, I could not forego what I consider a proper opportunity of calling the attention of the public to them.

In conclusion, I take occasion to say that, whatever may be the ultimate result of the case, I am more than pleased that the burden of this suit has been assumed by a high executive officer of the corporation; and that, while he has incurred the risk of giving dissatisfaction to a large majority of the board of supervisors, the benefit of his example, so just, so praiseworthy, and yet so novel, will have a tendency to allay an apprehension already strongly pervading this community, that there can be no restraint imposed upon the enormous extravagance and wasteful expenditures that have been so long indulged. The injunction must be continued until the final hearing.