*Scott, J.
This case came before us at the last term of [283 this court upon demurrer to the third and fourth pleas filed herein by the defendant. That demurrer was sustained as to both the pleas, and at the present term the defendant has filed a fifth plea, and various issues of law have been raised by demurrers of the respective parties to further pleadings in the case, all of which are now submitted for our determination.
We shall consider the questions arising upon the several demurrers in the order in which they are raised by the pleadings.
The first replication of the attorney-general, on behalf of the state, to the first and second pleas of the defendant, is that “ neither the Cincinnati Gas-Light and Coke Company, nor the persons act *284 ing under such name and style, are the persons named in said act of the general assembly, nor their associates, nor the successors of such persons, or of their associates,” with a conclusion to the country.
To this replication there is a general demurrer by the defendant.
It is claimed by counsel for defendant that this replication is a departure in pleading; that the information having been filed, and process issued against the defendant by its corporate name, and not against individuals, as usurpers of the franchise to be a corporation, the fact that the defendant has, or once had, a legal existence as a corporation is admitted, and can not therefore be drawn in question by the state, in its subsequent pleadings in the case.
On the other hand, it is argued by counsel for the state that an information in the nature of quo warranto will lie on the relation of the attorney-general, against a de facto corporation, in its assumed corporate name, to compel it to show by what title it exercises the franchise to be a corporation.
This proceeding is instituted under the authority given by the act of May 1, 1852, “to prescribe the duties of the attorne3''-genera] ” (S. & C. Stat. 88), and that authority is to be found, if at all, in sections 9, 10, and 12 of the act.
Section 9 is as follows: “ That upon complaint made to him that 284] any incorporated company has offended against the laws *of the state, misused its corporate authority, or any of its franchises and privileges, assumed franchises and privileges not granted to it, or surrendered, abandoned, or forfeited its corporate authority, or any of its franchises or privileges, he shall inquire into the complaint, and if he should find probable cause for so doing, cause proceedings in the nature of quo warranto or writ of scire facias to be instituted against it.”
Section 10 is in the same terms, except that it authorizes the action of the attorney-general to be taken of his own motion, whore the knowledge comes to him otherwise than by complaint.
These sections authorize proceedings to be instituted only against an incorporated company; and when the attorney-gen eral proceeds under them, he clearly admits thereby that the defendant has been incorporated.
That portion of section 12 which bears upon the question is as follows: “Whenever an j person or number of persons shall act or assume-to act as a corporation within this state without being legally *285 authorized so to do, the attorney-general may, upon complaint made to him, or upon his own motion, cause proceedings, in the nature of quo warranto, to be instituted, and the same diligently prosecuted to judgment.”
This part of the act authorizes proceedings to be instituted when a natural person, or any number of persons, without legal authority, assume to act as a corporation, and would seem to be the only authority under which the fact of incorporation can be drawn in question. The mode in which proceedings are to be instituted is not, however, expressly prescribed.
In the general quo warranto act of 1838 a similar distinction is made. The first section authorizes an information to be filed in the nature of a quo warranto, by the prosecuting attorney, “ when any association of persons shall act as a corporation within this state without being legally incorporated; ” while the eighth section authorizes a similar information to be filed “ against any corporate body ” when it has violated the provisions of its charter, ferfeited its franchises by non-user, or surrendered, or misused its corporate franchises. In giving a construction to this statute in the case of the *Granville Alexandrian Society, 11 Ohio, 8, it was said [285 by the court that the information under the first section must be against the natural persons who assume to act as a corporation, but under the eighth section it must be against the corporation.
As to the rule of the common law, the authorities, English and American, bearing upon this question, are not so explicit and uniform as to relieve the subject from all doubt. Much learning and research have, from time to time, been shown in its discussion.
We do not propose to examine in detail the cases cited in argument. The most of the cases referred to by counsel for the state were informations against individuals. In the famous case of the City of London, 8 Howell’s State Trials, 1039, the question was presented and ably argued, but was left undetermined by the court, as the judgment was that the city had forfeited its corporate franchises.
In Rex v. The City, of Chester, cited in Rex v. Amory, 2 Term, 565, there seems to have been a judgment against the city of Chester on default, for failing to show its right to be a corporation.
In this country, we think, the great weight of authority favors the ground taken by the counsel for defendant. In The People v. Sar. & Rens. R. R. Co., 15 Wend. 114, it was held that “ an informa *286 tion in the nature of a quo warranto filed, under the revised statutes, against a corporation by its corporate name, admits the existence of the corporation or that it once had a legal existence.” The revised statutes of New York, it is true, differ from ours, in prescribing the different judgments to be rendered in proceedings against corporations and against individuals. But this distinction in the judgments has its foundation in the common law; and,in that case, C. J. Savage quotes, with approbation, from the language of Sir Robert Sawyer, in Rex v. The City of London. “He says the rule is this: when.it clearly appears to the court that a liberty is usurped by wrong, and upon no title, judgment only of ouster shall be entered. But when it appears that a liberty has been granted, but has been misused, judgment of seizure into the king’s hands shall 286] be given. The treason is given : that which came from the king is returned there by seizure; but that which never came from him, but was usurped, shall be declared null and void. Judgment of ouster is rendered against individuals for unlawfully assuming to be a corporation. It is rendered against corporations for exercising a franchise not authorized by their charter. In such case, the corporation is -ousted of such franchise but not of being a corporation. Judgment of seizure is given against a corporation for a forfeiture of its corporate privileges.”
So, in a note to the case of The People v. Richardson, 4 Cowen, 97, it is said by the learned judge: “ If the information be for using a franchise by a corporation, it should be against the corporation. If for usurping to be a corporation, it should be against the particular persons.” To the same effect is Angell & Ames on Corporations, sec. 756. See, also, Commercial Bank of Natchez v. The State of Mississippi, 6 Sm. & Marsh. 599.
The form of the information in this case is certainly not without sanction. 23 Wend. 193; 6 Cowen, 196. But, practically, it seems to have been adopted and used only for the purpose of requiring the defendant to show its charter, in order that the extent of the franchises therein granted might be made the subject of inquiry.
We are aware of no case in this country, in which a body, sued as a corporation, has been ousted of the franchise to be a corporation, on the ground that it never had a legal corporate existence. And, in England, the only case of that kind appears to be that of Rex v. Chester; and it is worthy of observation that, in that case, the defendant was a municipal and not a trading corporation. *287 Where the inhabitants of a city are defendants, the difficulty in proceeding against them individually might, perhaps, create an exception to the general rule. But, upon principle, it certainly seems irregular that judgment should be asked against a defendant whose very existence the plaintiff denies.
And if the information and process in this case could be regarded as proceedings against usurping individuals, by a name which they have assumed, the case would not be relieved from difficulty. For, in that case, should judgment be rendered *for the defend- [287 ants on the question of corporate existence, the state could proceed no further. The corporation not being a party, no judgment of ouster could pass against it, for exercising franchises not authorized by its charter. But the present information is against the defendant by its corporate name; process has been issued and served upon it accordingly; and in the same corporate character it has appeared and pleaded. We think it is too late to question its corporate existence. We see no ground for discriminating, on this question, between the act which governs the proceeding in the present case, and the general quo warranto act. The practice, under both acts, has been uniformly the same ; and persons assuming, without authority, to act as a corporation have never been proceeded against otherwise than individually.
The demurrer of the defendant to this replication will accordingly be sustained.
The second replication filed to all the pleas remaining undisposed of is “that the defendant during the time mentioned in the information, nor at any time, did not have or exercise an exclusive right to open and use the streets for convoying gas to the said city and citizens thereof, as alleged in said pleas, or otherwise,” with a conclusion to the country.
This replication is demurred to generally, and also specially, for the reason “ that it does not aver that any person other than this defendant did, during the time mentioned in the information, have or exercise any right to open and use the streets,” etc.
The information had charged that the defendant had used, without warrant, the franchise, etc., of having and exercising an exclusive right to open and use the streets, etc. The defendant, by its pleas, admits that it has, during the time mentioned in the information, “used and exorcised” the franchise (among others) “of having and exorcising an exclusive right to open and use the *288 streets,” etc., and claims to justify the exorcise of this franchise under its charter, and what is called the Conover contract. This replication, properly construed, denies that the defendant, at any time, rightfully, or otherwise than by usurpation, had or exercised 288] the franchise in ^question. This special demurrer seems to proceed on the idea that the information and replication concede the defendant’s right to open and use the streets, and deny only its exclusive character. This assumption we think is not warranted by any pleading of the state. The defendant is bound to show the existence of the franchise and its exclusive character. The pleas of the defendant are so drawn that a finding and judgment in its favor as to this franchise might give much practical significance to the term exclusive. It is important, therefore, to understand the character and extent of the claim made by the pleas. As we understand it, the gas company claim to have the exclusive right to use the streets of the city of Cincinnati, for the purpose of laying pipes and conveying gas, a right exclusivo as against the city, so that the municipal authorities can neither use, nor authorize any other person or corporation to use the streets for a similar purpose. And this is not a mere claim made by empty speeches, the validity of which, so long as it remained unexercised, could not, perhaps, bo made the subject of investigation by a proceeding such as the present. But the company admits and affirms that it has given practical effect to the claim by the continuous exercise of this exclusive right. The company might have disclaimed the exercise of it, but it admits, asserts, and justifies the exercise. If the exercise of an exclusive right implies the exclusion of others from the enjoyment of that right, then the company admits that it has so excluded others, and can not call upon the state to show who have been excluded; and. as the company must stand or fall upon its own rights, it can not divert the inquiry to an investigation of the rights of others.
This replication purports to make an issue of fact, and concludes to the country. The special demurrer so treats it, and we have, so far, regarded it in the same aspect. But on the general demurrer which has been interposed to it, we must- consider its true char actor; and we think it makes only an issue of law. It denies merely the legal conclusion stated in the pleas, as to the rights conferred on the defendant by the charter and contract therein set out. *289, 290 Still, it operates as a demurrer to the pleas, and must be sustained if they are bad.
*The sufficiency of these pleas depends mainly on the ques- [289 tion of the validity of what is called the “ Conover contract,” which the defendant holds, by assignment, made with the consent of the city of Cincinnati. The terms of that contract are stated in the pleas, and questions are raised on behalf of the state, as to the power of the city council to grant to Conover the exclusive rights which it purports to confer, and as to the power of the gas company, under its charter, to acquire and hold said rights and privileges.
The defendant claims to have been incorporated by a special act of the general assembly of April 3,1837. The first section enacts that certain named persons and their associates are thereby “ created a body corporate and politic with perpetual succession, by the name and style of ‘The Cincinnati Gas-Light and Coke Company,’ and by that name they and their successors shall be capable in law of contracting and being contracted with, suing and being sued, defending and being defended, in all courts and places, and in all matters whatsoever; with full power to acquire, hold, occupy, and enjoy all such real and' personal estate as may be necessary and proper for the construction, extension, and usefulness of the works of said company, and for the management and good government of the same,” etc.
The second section defines the powers of the company as follows:
“Sec. 2. The corporation hereby created, shall have full power and authority to manufacture and sell gas to be made from any or all of the substances, or a combination thereof, from which inflammable gas is usually obtained, and to be used for the purpose of lighting the city of Cincinnati, or the streets thereof, and any buildings, manufactories, public places, or houses therein contained, and to erect necessary works and apparatus, and to lay pipes for the purpose of conducting the gas in any of the streets or avenues of the said city: Provided, that the said corporation shall so conduct their works as no<t to create any nuisance, that no permanent injury or damage shall be done to any street, lane, or highway in said city; but before digging up or removing any of *the [290 streets or alleys of the said city, the said corporation hereby created, shall first give notice to, and obtain the consent of the Gity council of said city for that purpose; the real estate which this corporation is entitled to hold shall not exceed in value fifty thousand dollars.”
*291 And the sixth section declares that, “Any future legislature may alter, modify, or repeal this act.”
This charter confers on the company full power to manufacture and sell gas, to be used for lighting the city of Cincinnati; and to lay pipes for the purpose of conducting the gas in any of the streets or avenues of the city; provided that the consent of the city council shall be obtained, before proceeding to dig up any of'the streets, etc., for that purpose. The pleas cleai’ly show that such consent of the city council has been obtained, and as the authority given to sell gas is general and unqualified, we think full authority is shown prima facie for the exercise of the right or franchise of using the streets, etc., of the city for the purpose of laying gas-pipes therein, as well as for selling gas to the city and its citizens at the price stated in the information, or at any other price which the vendees may agree to pay.
But this charter does not purport to grant to the defendant an exclusive right to the use of the streets, etc., of the city for the purpose of laying gas-pipes therein.
This brings us to the consideration of the question whether the effect of the charter, and the contract of the city with Conover, which was assigned to the defendant, was such as to confer on the defendant the exclusive right to open and use the streets of the city, etc., as claimed in the pleas.
The first question to be cotsidered, then, is: Had the city council of the city of Cincinnati power to pass the ordinance of June, 1841, through which the contract with Conover was made ? In determining this question it is necessary to consider the character of its provisions, and the nature of the powers and privileges which it purports to grant.
By the terms of this contract, the city council of Cincinnati undertook, to invest James F. Conover, his associates, their heirs, assigns, and successors with the full and exclusive privilege of using 291] the streets, lanes, commons, and alleys of said *city, for the purpose of conveying gas to the city and its citizens, for the term of twenty-five years from that date, and thereafter until the city council should purchase from said Conover, his associates, etc., their gas-works, pipes, fixtures, and appurtenances, at a fair ¡mice, to be ascertained as therein provided. Conover agreed, in consideration of the privileges granted, to furnish to the city such quantity of gas as might be required by the city council for public lamps, for lamps *292 at the engine-houses, and other public buildings and bridges belonging to the city at two-thirds of the lowest average price at which gas should be furnished to private individuals in five cities therein named; he also bound himself to lay six thousand feet of leading-pipe for gas within two years, and four thousand feet annually thereafter, till the principal parts of the city should be furnished with pipes. These are substantially the provisions of the contract.
It contains no restriction or limitation upon the price at which gas may be sold by Conover for private consumption ; and as no single establishment could furnish gas to any considerable portion of the city if wholly excluded from the use of streets and alleys for that purpose, Conover was secured for a generation to come against all practical competition by the exclusive franchise conferred upon him. No succeeding council for twenty-five years could interfere with this monopoly, or cause the public streets to be lighted with gas, otherwise than through Conover, pursuant to the terms of this contract; and freedom of action, and deliverance from a perpetual monopoly, could not then be obtained, unless it should be found convenient and judged expedient to purchase the gas-works for the city. Even legislative aid would be invoked in vain for relief, if this contract be valid.
We think it can not be doubted that the right to use the streets of a city for the purpose of laying pipes to convey gas, whether in the hands of a private corporation or a natural person, is a franchise, and as such can only emanate directly or indirectly from the sovereign power of the state. And the position that the city council of Cincinnati in making the contract with Conover is to be regarded as a private corporation, granting an easement in its own property, can not be ^maintained. In one sense, and [292 to a certain extent, the streets may be said to belong to the city; but, as highways, the public have an interest in them, the owners of adjoining lots have a special property interest in them, and the city council can not change the character of the public use to which they may have been dedicated by the original proprietors. Wherever the statute may have, from time to time, provided that the fee in the streets shall be considered as being vested, it has always declared that it shall be so vested for the uses of the dedication. Whatever powers of supervision and control the legislature may have conferred upon the city council for the purpose of rendering *293 the enjoyment of the public casement or use more convenient and beneficial, or with a view to the safety, health, convenience, or comfort of the inhabitants of the city, these 'powers are all of a public municipal character, and their exorcise is quite different from the acts of a private corporation dealing, at its discretion, with property over which it may exercise all the rights incident to absolute ownership.
Now, we concede that the streets of a city may be appropriated to authorized purposes, promotive of the convenience and welfare of its inhabitants, and not substantially interfering with the public casement or right of travel. And from partial appropriations of this character, rights of private property may arise which can not rightfully be disturbed. But when it is sought to couple with such partial appropriation a stipulation that no further use of unoccupied portions of the streets shall be thereafter permitted or made for similar purposes, this is not the exercise of the power of appropriation, but an attempt to prohibit its exercise; and when the effect is to create a private monopoly, the power of the city council thus to divest itself of authority conferred upon it as a public agent, for the benefit of others, must be clearly shown. The rule that “ whatever a man may lawfully forbear, that he may oblige himself against,” is limited to cases when a third person is not wronged, nor the public prejudiced by such obligation. 2 Shower, 391; Wilmot’s Opinions, 377.
The general assembly of Connecticut, in 1855, by an act amend-293] atory *of a charter previously granted to a gas-light company, declared that the right of said company to lay down gas-pipes in and through the streets, alleys, etc., of the city and town of Norwich, and to distribute gas through the same for the purpose of lighting said streets, alleys, etc., should be exclusive as against any and all persons and corporations, except such as might thereafter be invested by the general assembly with power to use said streets, etc., for the same purpose; and though the act limited the price at which the gas manufactured by the company might bo sold, yet the Supreme Court of that state held that the enactment was void in so far as it assumed to make the right conferred exclusive; and this, for the reason, among others, that it was in restraint of trade, a grant of a monopoly, and therefore against public policy, and in direct conflict with the whole theory of a free government. *294 Tho Norwich Gas-Light Co. v. The Norwich City Gas Co., 25 Conn. 19.
In England various statutes have declared the grant of monopolies by the king, with certain exceptions, to be void; and it has been held that they can be conferred only by act of Parliament. Bacon’s Abr., tit. “Monopoly.” And these statutes are supposed to be only declaratory of the common law.
But we do not propose to inquire into the power of the state legislature to confer, either upon a corporation or a natural person, any or all of tho franchises and rights with which tho present defendant claims to have been invested. And assuming that such a power maybe exercised directly, we are not disposed to doubt that it may also be exercised indirectly, through the agency of a municipal corporation, clearly invested, for police purposes, with the necessary authority. But we have referred to these authorities as our justification for saying that when a franchise so far in restraint of trade, and so pregnant with jnublic mischief and private hardship, is drawn in question, and is claimed to be derived through a municipal ordinance or contract, the power of the municipal authorities to pass the ordinance or enter into the contract must be free from doubt. It must be found on the statute book, in express terms, or arise from the *terms of the statute by implication [294 so direct and necessary as to render it equally clear. ■
What then are the statutory provisions from which the power in question is claimed to be derived ?
By tho act of March 1,1834, “to incorporate and establish the city of Cincinnati ” (32 Ohio L. L. 244), power was given to the city council to light said city, or any section or portion thereof, on petition of not less than two-thirds of the lot-owners in the part or parts of the city so to be lighted, and to defray the expenses by assessment of a special tax on the lots situated therein. No other or further power on the subject of lighting the city was conferred on the council by this charter.
But, on the 16th of March, 1839, an act amendatory of the charter was passed (37 Ohio L. L. 297), the 3d section of which is as follows:
“ Sec. 3. That said city council shall also have power to cause said city, or any part thereof, to be lighted with oil or gas, either by petition, as provided for in the act to which this is an amendment, or without petition, and to levy and collect such taxes for *295 that purpose, from the real estate bounding on the section or sections which may be so lighted, and in such manner as they may provide by ordinance; and, in order to facilitate the means of lighting said city, the city council shall have power, on behalf of the city, to borrow any sum of money not exceeding fifty thousand dollars, for such length of time, and at such rate of interest as they may contract to pay, not exceeding six per cent, per annum, and pledge the faith of the city for the redemption and payment of said debt; and the said city council shall have power to pass any ordinances to regulate the lighting of said city, and the protection of the works used for that purpose, and for the selling or disposing of any lights' to individuals and incorporations for the benefit of said city.”
We are aware of no other grant of power in regard to lighting the city from which the authority of the city council to pass the ordinance of June 16, 1811; can be claimed to be derived.
The section just quoted gives in general terms “the power to 295] *eause said city, or any part thereof, to be lighted with oil or gas,” either by petition as provided in the original charter, or without petition, and- to levy and collect taxes for that purpose by local assessment as before; and then, “to facilitate the means of lighting the city,” further powers are conferred, which seem clearly to contemplate the‘accomplishment of that object by means of the constructing and operating of works to be owned by the corporation, and which might bo used to furnish lights not only for public use but also for purposes of sale to individuals and corporations, for the benefit of the city.. We think, however, that the latter part of this section was not intended to limit the general power conferred to a particular mode of execution, but rather as an additional power, by means of which the end in view might be accomplished in a mode which could not have been adopted without special authority. It seems evident, however, that the contract in question could not have been intended to be, as it certainly was not, an execution of the power conferred, in the special mode authorized by this section. The authority to make the contract must therefore be found, if at all, in the general grant of power to cause the city to be lighted with oil or gas. This power carries with it, by implication, all such powers as are clearly necessary for the proper and convenient exercise of the power expressly granted; hence we see no reason to doubt that the city council might, by contract, provide for the light *296 ing of the city by gas; ancl as the use of the streets and alleys for the purpose of laying gas-pipes therein would be almost if not wholly indispensable to such an undertaking, it would clearly be competent for the city council to grant to the contracting party the right to such use. But no such necessity is perceived for making such right exclusive. The same streets might consistently bo used by two or more persons or companies for the purpose of laying down their gas-pipes. If, under the general power here given, a single city council might bind its successors not to make or permit any further use of the streets for a similar purpose for a period of twenty-five years, why not for a hundred years, or in perpetuity? "Was such the legislative intention ? If so, we fail to discover *it, either [296 in the express terms of the statute, or as arising therefrom by clear and necessary implication.
It is claimed in argument that sundry acts of subsequent legislation have recognized the contract in question, without disapprobation. Some of the statutes referred to may reasonably be regarded as recognizing the existence of the contract, but in none of them do we find a legislative sanction or recognition of its validity. But we do find that the act of April 7, 1865 (S. & S. 902), which was evidently intended for Cincinnati alone, prohibits the city council from making any agreement, by ordinance or otherwise, which shall give or continue to any person or persons the exclusive privilege of using the streets, etc., for the purpose of conveying gas to the city or the citizens thereof, or which shall not secure to the city council the right to purchase the gas-works, etc., at any time within the existence of such agreement or contract. A legislative disapproval of such contracts as against public policy, could not well have been expressed in a more significant manner.
In view of the well-established rules of strict construction to be given to grants of corporate power as against the public, we are constrained to hold that the city council of Cincinnati had no authority, at the time of the passage of the ordinance of 1841, to grant to Conover the exclusive right to use the streets of the city for the purposes therein expressed, and that the defendant could therefore acquire no such right by the assignment of his contract. The first plea of the defendant must therefore be held insufficient.
As to the twenty years continuous user set up in the second plea, we think it can not operate as a bar to the information; for, waiving other grounds of objection, it is shown to be a user under a tempo *297 rary contract with the city of Cincinnati, and though called exclusive, it is not shown to have been a ttser inconsistent with a like use of unoccupied portions of the streets for a similar purpose by others. The mere use of a portion of the street for the purposes stated in the plea, is not in its nature exclusive as to other parts of the same street; and the fact that others have not exercised a similar right, 297] does not make defendant’s user the exercise of a bright to exclude others. Such partial use, for any length of time, however great, without more, can not as we think preclude inquiry into the right of the defendant to exclude others from that which does not interfere therewith. It is therefore unnecessary to inquire whether the limitation of the quo warranto act is applicable to a case, where the information is filed by the attorney-general.
The fifth plea, filed at the present term, differs from the second only in additional allegations, touching the re-enactment by the city council of Cincinnati, in 1854, of the ordinance of June, 1841, its acceptance by the defendant, and the performance by defendant of the stipulations of the contract, and the pendency of proceedings looking to a purchase by the city of defendant’s gas-works, etc.
It is sufficient to say that these additional averments do not change the character of the twenty years continuous user set up in the second plea, as in this one, by way of bar to the information. If the second plea is insufficient, the fifth is equally so, and for the same reason. The demurrer of the defendant to the second replication is therefore overruled.
The third replication of the attorney-general sets up, by way of bar to the right of the defendant to charge two dollars and fifty cents for every thousand cubic feet of gas furnished to the citizens of the city of Cincinnati, an act of the legislature of April 5, 1854, providing that it should be lawful for the city council of any city in which a gas company had been or might thereafter be established, to fix from time to time by ordinance the minimum price at which such council should require such company to furnish gas to the citizens, public buildings, etc., of such city, for any period not exceeding ten years; and providing that after the assent of said company to such ordinance, by written acceptance, etc., it should not be lawful for said city council to require said company to furnish gas at a less price during the period agreed on. And in connection with this act, the replication also sets up an ordinance of the city council of Cincinnati, passed August.16, 1867, which pro *298, 299 vides and requires that for the period of one year from September 1, 1867, the present defendant should furnish gas of the standard quality to the public buildings of *the city, and to citizens or [298 private consumers, at the rate of two dollars for each one thousand cubic feet so furnished, and should charge no greater sum therefor.
To this replication the defendant files five rejoinders, to all of which there is a general demurrer on behalf of the state.
As this demurrer puts in issue the sufficiency of the replication, it is proper first to consider that question.
By the thirtieth section of the act of March 11,1853, amendatory of the towns and cities act (S. & C. 1534), it was provided “that the city council of any city in which gas companies have been or may hereafter be established, bo and are hereby empowered to regulate, by ordinance of such city council, from time to time, the price which such gas-light or gas-light and coke company shall charge for any gas furnished by such companies to the citizens, public buildings, streets, lanes, or alleys in such cities, and that said gas-light or gas-light and coke companies shall in no event charge more for any gas furnished to such city, or to individuals, than the price specified by ordinance of such council.”
The defendant’s charter is a special one granted in 1837, and contains a provision expressly subjecting it to alteration, modification, or repeal by any future legislature. It is claimed on behalf of the defendant that the reserved power of alteration, modification, or repeal can be exercised only by the legislature, and can not be delegated to a city council; and that the act of 1853 being a general law, was not intended to aj>ply to gas companies incorporated by special acts. But we see no room to doubt that the act of 1853 was intended to apply to this defendant as well as to other corporations of like character. The words of the act are general and comprehensive; they contain no exceptions, but embrace not only the “ gas-light ” companies of the general corporation act of the preceding year, but “ gas-light and coke companies,” seeming to refer to the particular name of this defendant. The terms of the act relate to companies which have been, as well as to those which may hereafter be established in " any city.” The generality of these words can not be so restrained as to exclude from their operation the largest city of the state, and limit it to companies created under the general law of the year before, *of which there could [299 have been but few. Besides, the policy of the constitution, then *300 recently adopted, required uniformity in the powers conferred upon corporations of the same class, and to that end prohibited the grant of corporate powers by special acts; and as defendant's charter was completely in the power of the legislature, and could be modified at pleasure, or wholly repealed, there is no reason to suppose that the defendant was intended to be exempted from the operation of a general law imposed upon gas companies generally. And it seems clear that it is the statute itself, and not the action of the city council under it, which alters or modifies defendant’s charter. It is the legislative act which prescribes the new rule of corporate action, though the city council is made an agent in its administration.
Holding the replication good, we pass then to the consideration of the five rejoinders.
The first is, that by a decree of the circuit court of the United States for the southern district of Ohio, in a cause wherein Sophia C. Deane was complainant and the defendant and the said city and Others were defendants, the defendant was, at the October term, 1867, enjoined from obeying, and the said city and all the citizens thereof from enforcing said ordinance of the 16th of A ugust, 1867; which decree was, when the information was filed, and still is, in full force.
The State of Ohio was no party to the proceedings and decree here set up, and is not, therefore, bound by them. We do not see how her right to assert the validity of the ordinance in a case like the present, can be affected by that decree. The demurrer to this rejoinder must be sustained.
The second rejoinder is, that the defendant has not assented to or accepted the said ordinance.
The act of 1853 authorized city councils, from time to time, to regulate, by ordinance, the price at which gas companies should furnish gas; and under this authority the price of gas might be changed as often as the council might think proper. The act of 1854' provided a mode by which stability might bo given to prices for a period not exceeding ten years, and gas companies bo secured against any change of price to their prejudice during such period. 300] This object might be effected *by an ordinance fixing-the price for a definite period, which should have the effect of a contract, when assented to by written acceptance of a gas company. But if no such assent were given by the company, the ordinance *301 ■would still remain valid as such, and be subject to modification by the council as before. An acceptance by the company would bind the council not to lower the price during the period specified in the-ordinance ; but a failure to accept would not affect the validity of the ordinance, but would leave the council free and untrammeled in the exercise of the power conferred by the act of 1853. The demurrer to this rejoinder must be sustained.
The third rejoinder is, in substance, that for the fraudulent purpose of compelling the defendant to submit to an unfair appraisement of its gas-works and fixtures, with a view to the purchase of the same by the city, under such appraisement, a majority of the members of the city council, at a secret meeting, resolved to pass and enforce the ordinance stated in the third replication, although it was well known to them that the price named therein was not, and is not, an adequate price for gas in said city; and to carry out said fraudulent purpose the same members who composed said secret meeting adopted said ordinance.
If it be.competent, in a proceeding like the present, to inquire-into the motives, and good faith of the city council in passing the-ordinance in question, there is no room for doubt that the facts-stated in this rejoinder are sufficient to justify the defendant in disregarding its mandate. Such an act of injustice, perpetrated under color of a power conferred for a different purpose, would be entitled to no respect, here or elsewhere. But in support of the-demurrer it is argued that the validity of the ordinance can not be-impeached by an inquiry into the motives of the members of council who voted for it. We have been referred to no authority, and. have found none, which, in our judgment, is conclusive of the grave-question here presented. In Fletcher v. Peck, 6 Cranch, 87, cited by counsel for the state, it was held by the Supreme Court of the United States that in a contest between two individuals claiming-under an act of a legislature, the court *can not inquire into [801 the motives which actuated the members of that legislature in its-enactment. And in Miners’ Bank of, Dubuque v. United States, 1 Greene (Iowa). 553, which was an information in the nature of a quo warranto, it was held by the Supreme Court of Iowa that where the legislature reserve to themselves the power to repeal a. charter, upon a misuse or abuse of corporate powers, they may do-so without the interposition of a judicial tribunal; that they are-the .proper judges of such misuse or abuse, and that their acts,. *302 their motives, or the sufficiency of evidence before them, can not be collaterally questioned. But it is clear that a city council is to be distinguished, in many respects, from the law-making power of a sovereign state. As the legislature is a co-ordinate branch of the government, the jurisdiction of the judiciary to declare its acts of legislation within its constitutional sphere invalid on account of the improper motives which induced their enactment may well be denied. And the same rule should, perhaps, govern in the case of an ordinance passed by a city council in the exercise of the legislative powers conferred upon it for the purposes of police regulation, or municipal government. But this immunity from impeachment for fraudulent motives, or abuse of power, does not attach to all the acts of a city council which may assume the form of an ordinance. Davis v. The Mayor, etc., of New York, 1 Duer, 451.
The ordinance under consideration is not one of a general character, but operates upon the defendant alone, and was passed under the special authority of the act of 1853. The intention of the legislature, in the 30th section of that act, was to require incorporated gas companies, over whose charter it had the power of absolute control, to dispose of the gas which they might furnish for public or private use, at fair and reasonable prices. As such prices might vary with change of times and locality, the act provides for their ascertainment from time to time, through the agency of the city councils of the cities in which such companies might be ■established. The discretionary power given by the act to city councils might have been vested elsewhere; but, wherever vested, the gas companies, whose property interests are so vitally affected 302] *by it, have a right to demand that it shall be honestly exercised for the purposes for which it was given. Suppose the purpose and object to be accomplished by the passage of this ordinance, as alleged in the rejoinder, had been avowed by a preamble, and the price of gas had been fixed by its provisions at twenty-five cents per thousand cubic feet, could this court be called upon to declare any of defendant’s franchises or rights forfeited by noncompliahce with the requirements of such an ordinance ? Both public and private rights are to be protected, and for that purpose we must recognize the fact that a municipal as well as a private corporation can do wrong.
*303 We think the demurrer to the third rejoinder should be over¡ruled.
The fourth and fifth rejoinders, each set up as a bar to the right •of the state to inquire into the matters stated in the third replication, a judgment rendered in favor of the defendant by the district court of Hamilton county, at its May term, 1859, upon an information in the nature of a quo warranto, filed in said court, in the name of the state, against the defendant, by the prosecuting attorney of «aid county, upon the relation of Samuel M. Hart.
By the fourth plea of the defendant, this judgment of the district court was set up in bar of the information; and upon demurrer to this plea it was held, at the last term of this court, that such judgment for the defendant, upon an information in the nature of quo warranto, was not final and conclusive, so as to preclude the attorney-general from filing a subsequent information. And to that decision we are still inclined to adhere.
In the fifth rejoinder, the further facts are stated that the information in this case was filed by the attorney-general upon complaint caused to be made to him by the city council of the city of Cincinnati, and not because of anything coming to his knowledge otherwise, and that the information in the case in which the judgment of the district court was rendered, was filed on the relation of the city solicitor of said city, and by direction of said city council; and also that the defendant, relying upon the validity of said judgment of the district *court, has, since its rendition, [303 increased its capital stock, largely.,extended its operations, and expended large sums of money in making permanent improvements, and carrying out and fully performing on its part the stipulations of the contract with the city.
But we fail to perceive how these facts can affect the character of the judgment of the district court, or give it an effect as a bar, which it would not otherwise - have. The demurrer must therefore j'be sustained as to both the fourth and fifth rejoinders.
Day, C. J., and Brinkerhoff, Welch, and White, JJ., concurred.