Freedman, J.
By chapter 225 of the laws of 1842, the mayor, etc., were authorized to organize a department with full powers for the management of the Croton water works and distribution of the Croton water.
Pursuant to the authority thus conferred, the common council, on September 7, 1842, passed an ordinance to regulate the water works of the city of New York (Rev. Ord. 1845, 175).
By section 7, title 2 of those ordinances (page 177), the Croton Aqueduct Board was directed to fix, from time to time, the rate of rents to be paid by the inhabitants for the use of water, and to prescribe rules and regulations relative to the collection of such rates, such rates and rules to be subject to the approval of the joint Aqueduct Committee of the Common Council.
Chapter 383 of the laws of 1849 gave legislative approval to the plan embodied in the ordinance of 1842, and created a Croton Aqueduct Department in the city of New York. Section 18 of the act (page 544), authorized the establishment of a scale of rents, to be called “regular rents,” apportioned to different classes of buildings in reference to their dimensions, values, exposure to fire, ordinary uses for dwellings, stores, shops, private stables and other common purposes, number of families or occupants, or consumption of water, as near as might be practicable, and authorized the local authorities to modify, alter and amend and increase such scale from time to time, and to extend it to other descriptions of buildings and establishments. It was *483 provided that such “regular rents” should become a charge and lien upon such houses and lots respectively. Section 19 of the act provided that hotels, factories, stables and livery stables, and other buildings consuming extra quantities of water might, in addition to the “regular rents,” be charged with additional rents, to be called “ extra rents.” By section 37 (which was directed to be printed on the back of each permit) it was provided that the rules and restrictions for the use of the water printed on each permit should be notice to the water-takers, and should authorize the exaction and recovery of any penalties which the Croton Aqueduct Board might impose, in addition to cutting off the use of the water for violation of the rules.
Under this authority, the Common Council, on May 1, 1850, passed “An ordinance establishing the scale of water rents of the Croton Aqueduct Department.” With some amendments, this ordinance, which may be found in the volume known as the Revised Ordinances of 1859, page 143 (see also Rev. Ord. of 1866, 160), continued to be the scale of water rents in ISew York in .actual operation up to the year 1870. This ordinance, w,ith great detail, prescribes various rates of charge for the several stores and kinds of buildings, and for the different classes of business that are specifically enumerated ; and it also provides that a charge of not less than one cent for one hundred gallons shall be made to all manufacturing and other business requiring a large supply of water. All matters not specified in the ordinance are by it reserved for special contract with the Croton Aqueduct Board.
Under this ordinance, and the authority conferred thereby upon the Croton Aqueduct Board to make special charges for the use of water, in cases where no rate was fixed, the use of a water-meter was frequently resorted to, to determine the actual consumption of water, and to adjust the charge to be made or rent to *484 be demanded therefor. In such cases the meter belonged to the city, and when the object of its use was accomplished, it was returned to the city. The exercise of this right was recognized and approved by the courts, and the charge was held to be a rent and not a tax (Treadwell v. Van Schaick, 30 Barb. 444 ; Trustees of Cannon Street Baptist Church v. Mayor, &c. of N. Y., 1 Hoffm. Laws 286).
The main difference between the so-called regular rent depending upon the size, character and general use of a building, and the extra rent chargeable in the discretion of the Croton Aqueduct Board for extra consumption, was that the first constituted»a lien upon the land, while the payment of the latter could only be enforced by cutting off the supply of water.
By chapter 137 of the Laws of 1870, entitled, “An act to reorganize the local government of the city of New York,” a department of public works was created, to which were transferred, among other things, all the powers and duties of the Croton Aqueduct Board. The head or chief officer of this department was directed to be known by the title of “ Commissioner of Public Works.”
By chapter 383 of the Laws of 1870, § 13, the commissioner of public works was authorized, in his discretion, to cause water-meters of approved pattern and suitable for the purpose, to be designated by said commissioner, to be placed in all stores, shops, hotels, manufactories, public edifices, at wharves, ferry houses, stables, and in all the places in which water is furnished for business consumption by the department of public works, and all expenses for meters, their connections and setting, and water rates, were made a lien upon the premises supplied.
By section 5 of chapter 574 of the Laws of 1871, it was provided: “ That the said commissioner of public works shall, from time to time, establish scales of *485 rents for the supply of Croton water, which rents shall be collected in the manner now provided by law.” This provision was expressly saved from repeal by section 119 of the charter of. 1873 (chapter 335).
The provisions of the act of 1870 were, with some modifications, incorporated into the charter of 1873, section 73 of which provides as follows :
“ . . . The commissioner of public works is hereby authorized, in his discretion, to cause water-meters, the pattern and price of which shall be approved by the mayor, comptroller and chief engineer of the Croton Aqueduct, to be placed in all stores, workshops, hotels, manufactories, public edifices, at wharves, ferry houses, stables, and in all the places in which water is furnished for business consumption by the department of public works, except private dwellings, so that all water so furnished therein or thereat may be measured and known by the said department,, and for the purpose of ascertaining the ratable portion which consumers of water should pay for the water therein or thereat received and used. Thereafter, as shall be determined by the commissioner of public works, the said department shall make -out all bills and charges for water furnished by them to each and every consumer as aforesaid, to whose consumption a meter as aforesaid is affixed, in ratable proportion to the water consumed, as ascertained by the meter on his or her premises or places occupied or used as aforesaid. All expenses of meters, their connections and setting, water rates and other lawful charges for the supply of Croton water, shall be a lien upon the premises where such water is supplied as now provided by law. . . .”
The provisions of 383 of Laws of 1870, and of chapter 335 of the Laws of 1873, contain the only specific expression of the legislative will upon the subject of water-meters, but they are not necessarily inconsistent with the existence of the power to place meters exercised *486 by the Croton Aqueduct Board prior to 1870, except so far as private dwellings are concerned. The object and effect of the statute of 1873 was not, therefore, to confer a new right to attach, water-meters to the supply pipes of the buildings w’here water was consumed, for that right had been previously exercised for many years with the approval of the courts. Its purpose is, as was the purpose of the statute of 1870, to compel the water-taker to bear the expense of the introduction of the meter, and to make such expense and the charge for extra consumption a lien upon the land. The question as to whether or not the water-takers are usin >• the water in such quantities that the ordinary-rate insufflciently remunerates the city, is left for the decision of the commissioner of public works in the exercise of his sound discretion, the only limits upon the exercise of that discretion being that the pattern and price of the meters to be used should be approved by the mayor, comptroller and chief engineer of the Croton aqueduct, and that no meter should be placed in a private dwelling.
The language of the statute of 1873 is plainly applicable to the premises of the plaintiff. The buildings thereon are four stories in height and are used as stores, workshops and manufactories. Among the tenants are lithographers, a wood-cut printer, a printer of newspaper envelopes, a composing printer, a book públisher, a printing-ink storekeeper, a rubber and leather storekeeper, &c.
It is contended, however, that nevertheless the statute does not apply, because all the water used by these tenants for business purposes comes from a tank on the fourth floor which is supplied with well water by an engine on adjacent premises ; because the Croton water used is used only for the purposes of drinking and washing hands, and because the value of the whole quantity of Croton water thus actually consumed does *487 not, according to the established rates, come up to the regular rate imposed upon the buildings as such and payable in any event. In other words, the claim is that the legislature intended to give to the commissioner the power to place meters in stores, workshops, &c., only when the water supplied to them is furnished for business consumption. Such a meaning cannot be given to the language of the statute, if regard is had to the ordinary rules of grammatical construction. fsTor do the rules of statutory construction permit it. The sentence in question, which is plain of comprehension as it stands, would have to be subjected to alterations and additions before it could be made to convey the meaning which the plaintiff desires it should have. Such additions, for instance, would be the words “ that is to say ” to be inserted after the word “stables,” or the word “other” to be inserted before “places.” Besides, the adoption of the meaning contended for by the plaintiff, would lead to absurdities in the practical enforcement of the statute.
Irrespective, therefore, of the question of actual consumption of Croton water for business purposes, the commissioner of public works in the exercise of a sound discretion may place a meter in any building other than a private dwelling, which falls within one of the classes of buildings enumerated in the statute, and the occupants of which have it within their power to use more water than the regular or building rate covers. Within these limits no court has a right to interfere with or control the exercise of his discretionary power by substituting its own judgment for his. It is only when its interference is necessary to prevent abuse, injustice, or oppression, the violation of a trust or the consummation of a fraud, that a court of equity has power to review the exercise of discretionary power vested by law in a public officer (Davis v. Mayor, &c. *488 of N. Y., 1 Duer, 498 ; affirmed as People v. Sturtevant, 9 N. Y. 263).
The case at bar presents no such exceptional fea-. ture. The fact that the tenants are restricted by the plaintiff in their use of the Croton water is not enough. This is no guaranty to the city that they will always respect the restriction. The power and the temptation to use the Croton water in the course of their business exist, and the commissioner of public works is not to be expected to provide and maintain an efficient system of espionage or regular inspection at short intervals to prevent them from making the most of the opportunity. It is the office of the water-meter to prevent such a result.
True, no deduction will be made from the regular rate, if the quantity of water consumed, as shown by the meter, should amount, at meter rates, to a smaller rate. But if it should amount to a larger sum, the regular rate' will be deducted. At any rate, if the plaintiff will be as vigilant hereafter as she is at present to enforce the restriction imposed upon her tenants, she will suffer no loss from the introduction of the.meter.
Nor is there anything in the danger apprehended from a bursting of the meter. The cost of properly protecting the meter against frost, is very slight, and if properly protected it will no more burst in cold weather than the lead pipe through which the water flows into the building. In the two instances given by the plumbers called by the plaintiff where meters did burst, it appeared that no precaution had been taken to prevent such an accident.
Other grounds have been urged, and especially the change wrought in the drainage facilities of the premises by the erection of the Brooklyn bridge. I have duly considered them all, but failed to find in them any reason which would justify an interference with the discretion lodged by law in the commissioner.
*489 The constitutional objections urged against the statute conferring this discretionary power upon the commissioner are clearly untenable. The statute is in the nature of a police regulation. Its object is not only to save money or secure revenue to the city, but also to enhance the comfort and convenience of its citizens in" general and to afford better means of protection for their property. Laws and ordinances relating to the comfort, health, convenience, good order and general welfare of the inhabitants, are comprehensively styled police laws, and it is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances.
The defendants are entitled to judgment dismissing the complaint on the merits, with costs.